2006 OK 67

Rae **WORSHAM,** individually, and as Administratrix of the Estate of Michael Worsham, and the Estate of Michael Worsham, Plaintiffs/Appellants/Counter–Appellees,

v.

Jeff **NIX** and Scott Scroggs, d/b/a Nix & Scroggs Law Firm, Defendants/Appellees/Counter–Appellants.

Nos. 100,750, 101,167.

Supreme Court of Oklahoma.

Sept. 19, 2006.

Bill V. Wilkinson, Wilkinson Law Firm, Tulsa, OK, for Plaintiffs/Appellants/Counter–Appellees.

Joseph R. Farris, Paula J. Quillin and Jody R. Nathan, Feldman Franden Woodard & Farris, Tulsa, OK, for Defendants/Appellees/Counter–Appellants.

LAVENDER, J.

¶ 1 Plaintiffs, Rae Worsham, individually and as administratrix of the estate of Michael Worsham (decedent) (Rae is decedent's widow), and decedent's estate sued Defendants, Jeff Nix and Scott Scroggs, d/b/a Nix & Scroggs Law Firm (Defendants) for breach of contract, legal malpractice/professional negligence and fraud. This appeal by Plaintiffs is from a judgment in favor of Defendants and requires determination of four main issues. One, in view of the prior opinion by the Court of Civil Appeals (COCA), Division II in *Worsham v. Nix* (*Worsham I*), 2004 OK CIV APP 2, 83 P.3d 879, *cert. denied* (Okla.Sup.Ct., Dec. 15, 2003)[1], does the law of the case doctrine foreclose a claim against Defendants for the

---

1. Initially, by Order of October 13, 2003, this Court granted certiorari to review the decision of the Court of Civil Appeals (COCA), Division II in *Worsham v. Nix* (*Worsham I*), 2004 OK CIV APP 2, 83 P.3d 879, *cert. denied* (Okla.Sup.Ct., Dec. 15, 2003). By Order of December 15, 2003 we withdrew the Order granting certiorari as improvidently granted and denied certiorari.

wrongful death of decedent, who committed suicide about four months after retaining Defendants for legal representation to assist in stopping alleged workplace harassment he was experiencing from co-workers at Public Service Company of Oklahoma (PSO)? Two, did the trial court err in precluding, as unreliable, the testimony of Plaintiffs' expert on the issue of factual proximate cause? Three, did the trial court err in ruling as a matter of law that Rae Worsham individually is precluded from recovering emotional distress damages purportedly suffered upon her learning of apparent fraudulent conduct on the part of Defendant Scroggs? Four, is an amount recovered through a settlement with PSO in separate litigation brought by Plaintiffs for decedent's wrongful death and other claims admissible at trial upon remand to reduce the amount of damages recoverable by Rae Worsham individually in regard to the just mentioned fraud claim should she adequately show entitlement thereto?

¶2 We hold the wrongful death claim is foreclosed by the law of the case doctrine and the trial court did not err in so ruling. We also hold the trial court did not err by excluding the testimony of Plaintiffs' factual proximate cause expert, without which Plain-

tiffs failed to show any damages for pre-suicide emotional distress suffered by either decedent or Rae Worsham individually were proximately caused by any wrongful conduct of Defendants. However, we hold the trial court erred in precluding as a matter of law Rae's individual claim, based on fraud, to recover damages for emotional distress allegedly suffered by her upon learning of apparent fraudulent conduct of Defendant Scroggs concerning the legal representation. We also hold an amount recovered through a settlement with PSO in separate litigation brought by Plaintiffs for decedent's wrongful death and other claims is not admissible at trial upon remand to reduce the amount of damages recoverable by Rae Worsham individually in regard to the just mentioned fraud claim should she adequately show entitlement thereto. The trial court judgment is affirmed in part and reversed in part, the reversal only in so far as the judgment precluded the last mentioned fraud claim of Rae Worsham in her individual capacity.[2]

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

¶3 Decedent was an employee of PSO. Apparently, in the early 1990s, co-workers

2. Defendants, Jeff Nix and Scott Scroggs, d/b/a Nix & Scroggs Law Firm (Defendants), after the trial court's May 2004 judgment in their favor, filed a motion for attorney fees relying on 12 O.S. § 1101.1. The trial court denied the motion. Case No. 101167 is Defendants' appeal of the denial. That appeal was consolidated with the appeal by Plaintiffs, Rae Worsham, individually and as administratrix of the estate of Michael Worsham (decedent), and the estate of decedent in Case No. 100750. Section 1101.1, last amended in 2002, concerns offers of judgment, counteroffers of judgment, and the effect thereof on the propriety of the recovery of litigation costs and attorney fees in certain civil actions. In that we reverse the trial court judgment as to Rae Worsham's individual fraud claim and upon retrial she might recover more than the purported offer of judgment made by Defendants, we deem it unnecessary to decide any issue concerning the denial of Defendants' attorney fee motion.

Also, on May 31, 2005 Plaintiffs filed a motion to strike a portion of Defendants' reply brief in support of Defendants' counter-appeal. The motion is based on the argument that, in part, the reply brief inappropriately responded to matters in the main appeal, Case No. 100750, rather than replying only to counter-appeal issues relating to the attorney fee question. Plaintiffs cite Okla-

homa Supreme Court Rule 1.10(b), 12 O.S.2001, Ch. 15, App. 1, a rule concerning briefs in multiple appeals. Defendants' reply brief in support of counter-appeal (filed May 27, 2005) is three pages in length and Plaintiffs are technically correct that a portion of it (about 3/4 of a page) is devoted to issues in the main appeal, pointing out places in Plaintiffs' earlier combined reply brief and answer brief (filed May 18, 2005) that Defendants contended mistakenly asserted they had failed to respond to or address certain issues as to the main appeal in Defendants' combined answer brief and brief in chief (filed April 19, 2005). Although, as noted, Plaintiffs are technically correct that Defendants' reply brief in support of their counter-appeal was used, in part, to briefly respond to certain issues related to the main appeal, we **deny** Plaintiffs' motion to strike as nothing in the brief has substantively impacted our disposition of Plaintiffs' appeal in case No. 100750.

3. The factual matters set out are taken from the evidence presented at the May 2004 non-jury trial, at which only two witnesses actually testified, Rae Worsham and Defendant Scroggs; from admissions or concessions in the briefs or submissions of the parties filed either in the trial court or on appeal or made at oral presentations

began taunting and teasing him about being a bomber. The precipitating event was decedent being accused of making an anonymous telephone bomb threat to PSO and other employees learned of the accusation. No conclusive determination was made as to the perpetrator of the bomb threat and decedent remained in PSO's employ. After the Oklahoma City bombing in 1995 the taunting and teasing appears to have escalated and included likening him to Timothy McVeigh, i.e., a perpetrator of the Oklahoma City bombing.

¶ 4 According to Plaintiffs, the situation at work resulted in decedent having serious mental and emotional problems and, in effect, that his mental and emotional stability steadily declined as a result of the situation. Officials with PSO were notified by decedent of the situation and both decedent and Rae complained to one or more PSO officials about the problem, but the taunting and teasing from co-workers continued. At the May 17, 2004 non-jury trial eventually held in this matter, Rae testified to having no knowledge of anyone at PSO doing any investigation as to the alleged workplace harassment and, even after the aforementioned complaints, her view was that no one at PSO did anything to stop it.

¶ 5 In January 1998 the Worshams retained Scroggs for legal representation. Although Rae testified at trial that she had some contact with Nix during the representation, it was mainly to pass along messages to Scroggs. Nix was not directly involved in representing the Worshams either before or after decedent's suicide.

¶ 6 In essence, Plaintiffs claimed Defendants were retained by decedent and Rae to assist in stopping what they viewed as harassment decedent was experiencing from PSO co-workers, harassment claimed to be in violation of PSO written policy. Rae basically testified at trial that the purpose of the representation did not include the recovery

of money. In effect, she testified Scroggs promised to contact PSO concerning the alleged workplace harassment, to threaten PSO with suit if it did not cease and if that did not work, to file some type of suit against PSO in an attempt to stop it. At trial Scroggs denied he was hired by the Worshams to stop the alleged harassment; instead, his understanding was he was hired to file a lawsuit to recover monetary damages for defamation.

¶ 7 Scroggs was retained by a January 29, 1998 written "Contingency Fee Contract" listing decedent as the client, but signed by both decedent and Rae as clients. The contract also indicated decedent had a cause of action arising out of "defamation at PSO" and that the "CLIENTS desire[d] to employ [Scroggs] to prosecute the same to a final settlement or judgment and collection thereof; and ... [Scroggs] consent[ed] to accept such employment...." The contract required a non-refundable retainer of $650 and $75 in court costs to be paid and also contained percentage contingency fee terms. Although plainly an argument could be made the "Contingency Fee Contract" is inconsistent with the view Defendants were retained **solely** to stop the alleged workplace harassment and not, at least in part, to recover monetary damages, for purposes of our disposition of the issues here we assume as true Rae's recitation of the representation's purpose, i.e., legal assistance in stopping workplace harassment. Also, we recognize that retention to sue for money damages is not inconsistent with the clients desiring assistance and the attorney agreeing to assist in trying to stop taunting and teasing by co-workers through attorney contact with the employer in an effort to resolve the situation.[4]

¶ 8 Scroggs testified at trial he did contact an unnamed person at PSO he believes was in the human resources (HR) department

before the trial court by the parties' attorneys; and, finally, from two prior published decisions: 1) *Worsham I, supra* note 1 and 2) *State ex rel. Oklahoma Bar Ass'n v. Scroggs (Scroggs I )*, 2003 OK 21, 70 P.3d 821, *reh. dismissed as moot by unpublished Order* (Okla.Sup.Ct., June 9, 2003), an attorney disciplinary case involving Scroggs.

4. In *Scroggs I, supra* note 3, it is stated, "[t]he Worshams wanted [Scroggs] to contact [decedent's] employer and stop alleged harassment to decedent occurring during his employment. [Scroggs] told the Worshams that he would contact [PSO], its Human Resources Department and [PSO's] lawyers." *Id.,* 2003 OK 21, ¶ 46, 70 P.3d at 832.

about his representation of decedent and that, in effect, left his name and telephone number for someone in the HR department (apparently the HR manager) to call him back. He did not recall anyone from PSO returning his call. Plaintiffs dispute that even this minimal contact was made by Scroggs. In any event, assuming the contact was made by Scroggs, apparently nothing substantial came from it.

¶ 9 However, in *State ex rel. Oklahoma Bar Ass'n v. Scroggs* (*Scroggs I* ), 2003 OK 21, 70 P.3d 821, *reh. dismissed as moot by unpublished Order* (Okla.Sup.Ct., June 9, 2003), an attorney disciplinary matter in part involving Scroggs' representation of the Worshams, it is stated: "[PSO] learned that [decedent] had retained counsel and required him to see a psychiatrist as part of an employee assistance program" and "[decedent] was placed on leave of absence with pay." *Id.,* 2003 OK 21, ¶ 43, 70 P.3d at 831. It seems decedent himself informed one or more PSO officials he had retained counsel. *Worsham I* states, "[decedent] informed his supervisor that he had hired a lawyer and a lawsuit had been or was going to be filed to stop the harassment." *Id.,* 2004 OK CIV APP 2, ¶ 10, 83 P.3d at 884. It appears decedent did not remain on leave status, but returned to work for some period of time.

¶ 10 A petition was prepared by Scroggs (and/or his office staff) whereby decedent was to sue PSO for defamation and intentional infliction of emotional distress. Decedent verified the petition in March 1998. The petition requested compensatory and punitive damages, as well as "all other appropriate relief, at law or **in equity,** including costs and a reasonable attorney's fee." (emphasis added). Although equitable relief was generally requested, no specific relief in the form of a temporary restraining order (TRO), preliminary or permanent injunction prohibiting workplace harassment was requested.

¶ 11 The petition was **never** filed. In *Scroggs I* this Court suspended Scroggs from the practice of law for one year for misconduct involving and including (but not limited to) his representation of the Worshams.

*Scroggs I* in part involved issue(s) surrounding the petition's non-filing. In effect, Scroggs blamed the petition's non-filing on a former law clerk. Scroggs claimed he instructed the clerk to file it in Tulsa County, but the clerk denied receiving the petition or being instructed to file it. *Id.,* 2003 OK 21, ¶ 44 and ¶¶ 52–54, 70 P.3d at 831–833. In *Scroggs I* we found Scroggs' explanation for the non-filing to involve misrepresentation on his part. *Id.,* 2003 OK 21, ¶ 56, 70 P.3d at 833. In *State ex rel. Oklahoma Bar Ass'n v. Scroggs* (*Scroggs II* ), 2003 OK 54, 71 P.3d 15, we approved Scroggs' resignation from the Oklahoma Bar Association pending disciplinary proceedings, a result tantamount to disbarment. *Scroggs II* involved numerous additional claims of misconduct against him.[5]

¶ 12 In late May 1998, i.e., about four months after Scroggs was hired, decedent committed suicide. Prior to the suicide Scroggs advised the Worshams he had filed suit against PSO, when, in fact, no suit had been filed. After the suicide, not being aware Scroggs had not filed suit against PSO, Rae retained him to file a wrongful death case against PSO. No wrongful death case was filed by Defendants against PSO and Scroggs misrepresented to Rae that a wrongful death suit had been filed or the initial suit had been amended to include a wrongful death claim. In the *Scroggs I* disciplinary proceeding he attempted to blame another law clerk for the non-filing of a new or amended petition against PSO. *Id.,* 2003 OK 21, ¶ 45 and ¶¶ 52–54, 70 P.3d at 831–833. We found Scroggs' explanation for that non-filing to involve misrepresentation on his part. *Id.,* 2003 OK 21, ¶ 56, 70 P.3d at 833. In or about September 1998 Rae learned that Scroggs had not filed suit against PSO, she terminated Defendants and hired her present attorney.

¶ 13 Eventually, Rae, individually, as estate administratrix and as parent and next friend of the Worshams' two sons, sued PSO (and another corporation affiliated with PSO) for decedent's wrongful death, for emotional distress suffered by decedent prior to his suicide and, apparently, for emotional dis-

---

**5.** In *Attorney Grievance Comm'n of Maryland v. Scroggs,* 387 Md. 238, 874 A.2d 985 (2005)

Scroggs was disbarred in Maryland as reciprocal discipline for the Oklahoma discipline.

tress suffered by Rae prior to the suicide, such pre-suicide emotional distress allegedly caused by the situation at work involving decedent's co-workers. The case against PSO settled for $90,000.

¶ 14 Plaintiffs also sued Defendants in a separate suit, the February 2000 amended petition of which brought claims for legal malpractice, fraud and breach of contract. Actual and punitive damages were sought and it became clear at some point Plaintiffs sought to hold Defendants liable for wrongful death, i.e., responsible for the suicide. A previous trial judge granted summary judgment to Defendants.

¶ 15 *Worsham I* involved the appeal of that summary judgment. There, the COCA reversed as to each theory of liability (i.e., legal malpractice, fraud and breach of contract), but affirmed as to Defendants' non-liability for the suicide/wrongful death. *Worsham I* also ruled that if it could be shown that legal malpractice/professional negligence caused foreseeable emotional distress to either decedent or Rae and that the emotional distress caused physical injury, damages may be recoverable for such distress. *Id.,* 2004 OK CIV APP 2, ¶ 28, 83 P.3d at 888. *Worsham I* further ruled the fraud claim might support the recovery of damages for emotional distress even in the absence of physical injury. This ruling was based on the view that given the factual circumstances surrounding Scroggs' alleged wrongful conduct, part of which was claimed to be fraudulent, a factfinder "could ... reasonably infer that emotional distress was a natural and probable consequence of Scroggs' [wrongful/fraudulent] action." *Id.,* 2004 OK CIV APP 2, ¶ 27, 83 P.3d at 888. As we understand *Worsham I,* the emotional distress referred to is that which decedent or Rae may have suffered pre-suicide by the failure to have taken appropriate steps to attempt to stop the alleged workplace harassment and misrepresenting his contact with PSO and that he had filed a lawsuit against PSO when no lawsuit had actually been filed. *See id.*

¶ 16 On remand Plaintiffs sought to reassert a wrongful death claim against Defendants. Refund of the $650 retainer paid and $75 in court costs advanced were sought. In addition, Plaintiffs (through the estate) sought monetary recovery for the emotional distress allegedly suffered by decedent prior to his suicide by the workplace harassment. Rae individually sought to recover damages for her pre-suicide emotional distress purportedly caused to her by the harassment at work decedent had experienced. Boiled down, Plaintiffs' theory was that Defendants were hired to assist in stopping the alleged harassment, they fell below the reasonable attorney standard of care in failing to provide such assistance and if they would have exercised an appropriate professional attorney standard of care in a timely manner the harassment would have ended prior to decedent's suicide. As to these emotional distress damages, it appears Plaintiffs viewed both the breach of contract and fraud claims as alternate bases for their recovery. Punitive damages were sought under the negligence and fraud claims.

¶ 17 In addition to the pre-suicide emotional distress damages set out above, our review of the record shows that on remand Rae sought to recover individually for the emotional distress she allegedly suffered **upon learning** about four months after the suicide that Scroggs had not filed any suit against PSO in regard to the workplace harassment, as he represented to both her and decedent he had and that he had misrepresented the extent, if any, of his contact with PSO. This claim to recovery of emotional distress damages, as we understand it, is fraud based and seeks to include within its ambit recovery for emotional distress allegedly suffered upon learning of the misrepresentation-type conduct of Scroggs concerning telling Rae he had filed a wrongful death case against PSO when he had not, although no compensatory relief is sought for the actual failure to file the wrongful death suit.

¶ 18 The matter was scheduled for and came on for a jury trial on May 17, 2004. Prior to trial both Plaintiffs and Defendants filed motions in limine and, as pertinent here, rulings were made on two such motions on the day of trial.[6] Defendants sought to pro-

---

**6.** In *Badillo v. Mid Century Ins. Co.,* 2005 OK 48, 121 P.3d 1080 it is stated:

hibit the testimony of Michael Howard Smith (hereafter Dr. Smith, holder of a PhD in consumer resource studies), a former employee of ONEOK and a HR professional. Basically, Plaintiffs presented Dr. Smith as an expert in the HR field and sought to present his testimony on the issue of factual proximate cause, Dr. Smith's opinion being that all large companies with HR departments would have taken steps to stop the purported harassment decedent was experiencing merely by being threatened with suit by an attorney or by the mere filing of the suit. After a hearing immediately preceding the scheduled trial at which Dr. Smith and Nix testified, Defendants' motion in limine was granted and the trial court excluded the testimony, essentially on the basis it was unreliable.

¶ 19 Plaintiffs' motion in limine sought to exclude evidence concerning the PSO suit settlement, mainly arguing its non-admissibility based on the collateral source doctrine or rule.[7] After extensive briefing and argument by the parties, the trial court essentially ruled on the day of trial that the claims of Plaintiffs in the PSO case and the PSO settlement were admissible. Relatedly, the trial court also ruled that all **alleged** damages for emotional distress, legal malpractice or fraud Plaintiffs sought in the instant case from Defendants were already recovered from PSO via the settlement and could not again be recovered from Defendants. This ruling, as we understand it, was basically two-fold.

¶ 20 One, in that damages for pre-suicide emotional distress were still potentially recoverable after decedent's suicide for both decedent and Rae from PSO, suit was actually filed against PSO to recover such damages and, according to Defendants' position, such damages were actually recovered by the settlement of the PSO case, Plaintiffs could not prove the damage element of any claim against Defendants for these pre-suicide emotional distress damages. Defendants' position in such regard relied on the case-within-a-case doctrine generally applicable in legal malpractice cases, i.e., that a legal malpractice plaintiff must prove the attorney's negligence caused the underlying case for which he/she was hired to be lost and that damages are normally proved in a legal malpractice case by introducing evidence establishing the value of the claim lost by the attorney's misconduct or neglect. *Nicholas v. Morgan*, 2002 OK 88, ¶ 14, 58 P.3d 775, 780–781.

¶ 21 Two, as to the fraud claim asserted by Rae individually for emotional distress alleg-

[A] party aggrieved by a ruling on a motion in limine must raise the issue at the appropriate time during the subsequent trial, either by objecting when the challenged evidence is admitted or by making an offer of proof if the question involves excluded matter. Rulings on a motion in limine are advisory and preliminary in nature and error is committed, if at all, when a ruling is made during trial by the trial court.
*Id.,* 2005 OK 48, n. 16, 121 P.3d at 1103 n. 16. (citations omitted).

7. In *Blythe v. University of Oklahoma,* 2003 OK 115, 82 P.3d 1021 the collateral source rule was generally summarized as follows:

The collateral source rule traditionally applies in the context of common law tort actions to determine the amount of compensatory damages 'which will compensate [the injured party] for all detriment proximately caused.' *See* 23 O.S.2001 § 61; *Denco Bus Lines, Inc. v. Hargis,* 1951 OK 11, 204 Okla. 339, 229 P.2d 560, 564. The general rule applied to determine the proper amount which will compensate for the injured party's 'whole loss' in a common law tort action is as follows: 'total or partial compensation for an injury received by the injured party from a collateral source wholly independent of the wrongdoer will not operate to lessen the damages recoverable from the person causing the injury.' *Id.* at 564 (quoting 15 AM. JUR. *Damages* § 198). Further,

[i]t is well settled that damages recoverable for a wrong are *not diminished* by the fact that the party injured has been wholly or partly idemnified [sic] for his loss by insurance effected by him and to the procurement of which the wrongdoer did not contribute. . . . The same has been held true of compensation received by an employee from a benefit fund maintained by the employer.
*Id.* (quoting 15 AM. JUR. *Damages* § 201)(emphasis added). Pursuant to these authorities, in *Hargis,* this Court determined that '[u]nder the [damages] statute the receipt of compensation by the injured party from a collateral source wholly independent of the wrongdoer would not operate to lessen the damages recoverable from the person causing the injury.' *Id.*
*Blythe,* 2003 OK 115, ¶ 7, 82 P.3d at 1026. (footnotes omitted).

edly suffered by her **upon learning** in or about September 1998 (i.e., about four months after the suicide) that no suit had been filed by Scroggs before or after the suicide, the transcript of the May 17, 2004 proceeding seems to show the trial court became convinced the claim was waived by representations of Plaintiffs' counsel either orally or in one or more written submissions in the trial court. Plaintiffs' counsel orally, but specifically, denied any such waiver. No waiver finding is actually made in the trial court's May 2004 Journal Entry of Judgment which merely determined that all of Plaintiffs' **alleged** emotional distress damages were recovered in the PSO lawsuit and could not again be recovered against Defendants based on any theory espoused. The Journal Entry of Judgment, in effect, further sets out it is in part based on "representations in court" of counsel. We assume by the use of the word **alleged** and reliance in part on "representations in court" of counsel to support its ruling, the trial judge intended to impliedly incorporate in the Journal Entry of Judgment the apparent oral waiver ruling.

¶ 22 On the day of trial the parties agreed to waive jury trial without prejudice to reassert a request therefore should this matter be reversed in whole or in part on appeal and they agreed to try the matter in an abbreviated fashion by a non-jury trial. Two witnesses actually testified at the trial, Rae and Scroggs, both presented by Plaintiffs. Offers of proof were made by Plaintiffs as to the testimony of Dr. Smith and as to the emotional distress suffered by both decedent and Rae pre-suicide and by Rae upon learning in September 1998 of Scroggs' alleged fraudulent conduct in relation to the legal representation for which he was hired. The trial court excluded Dr. Smith's testimony and the emotional distress evidence sought to be elicited from Rae and two other witnesses (a therapist and a psychologist) concerning the emotional distress allegedly suffered by either decedent and/or Rae and allegedly caused by Defendants' wrongful conduct. Plaintiffs rested their case.

¶ 23 Defendants then rested their case without calling any witnesses and they moved for judgment. The trial court granted judgment to Defendants based on the earlier ruling that all **alleged** damages for emotional distress, legal malpractice and fraud were previously recovered via the PSO litigation and, therefore, Plaintiffs could not recover such damages again from Defendants. As to refund of the $650 retainer the trial court weighed the evidence that had been presented on that issue and ruled, in effect, that Defendants performed sufficient legal services to earn that as a fee and that Plaintiffs failed to meet their burden to show entitlement to a refund of that amount. As to the $75 in court costs paid to Defendants the trial court ruled that a check for that $75 had earlier been tendered and returned to Rae, a check which at the time of trial she had not cashed. As to the wrongful death claim, although not specifically mentioned in the trial court's May 2004 judgment, the trial judge had earlier ruled the claim was foreclosed by the law of the case doctrine in light of the opinion in *Worsham I*.

¶ 24 We hold the trial court did not err in ruling the wrongful death claim was foreclosed by the law of the case doctrine. We also hold no reversible error occurred by the exclusion of Dr. Smith's testimony, without which Plaintiffs failed in their burden to show any damages for pre-suicide emotional distress suffered by either decedent or Rae were proximately caused by any wrongful conduct of Defendants. As to Rae's individual claim to recover for emotional distress allegedly suffered upon her learning in September 1998 of Scroggs' claimed fraudulent conduct concerning the representation, we hold the claim to damages therefor was not waived and the matter must be remanded for further proceedings in regard thereto. We finally hold that the amount recovered through the settlement with PSO is not admissible at trial upon remand to reduce the amount of damages recoverable by Rae Worsham individually in regard to this fraud claim should she adequately show entitlement thereto.[8]

---

8. Neither appellate brief submitted to us by Plaintiffs (March 14 and May 18, 2005) presents any argument or authority in support of reversal of the trial court's rulings regarding refund of the $650 retainer or relating to the $75 in court costs. Thus, we have no occasion to delve into

## THE WRONGFUL DEATH CLAIM IS PRECLUDED BY THE LAW OF THE CASE DOCTRINE

■ ¶ 25 In *Worsham I* one of the issues before the COCA was "whether Defendants [could] be held liable for [decedent's] suicide." 2004 OK CIV APP 2, ¶ 1, 83 P.3d at 882. *Worsham I,* in effect, dealt with two potential exceptions to the general rule that suicide is considered an intervening force breaking the chain of causation from a defendant's wrongful conduct to the death and therefore a defendant will not normally be civilly liable for the death. *Id.,* 2004 OK CIV APP 2, ¶¶ 11–24, 83 P.3d at 884–887.

¶ 26 The two potential exceptions are 1) where the suicide is a foreseeable event to the defendant [*id.,* 2004 OK CIV APP 2, ¶¶ 13–20, 83 P.3d at 884–886] and 2) when the wrongful conduct of a defendant actually brings about delirium or insanity in the decedent for which a defendant would be liable and the decedent, while delirious or insane commits suicide, if the delirium or insanity a) prevents him from realizing the nature of the suicidal act and the certainty or risk involved therein or b) causes an irresistible or uncontrollable urge to commit suicide. *Id.,* 2004 OK CIV APP 2, ¶¶ 21–24, 83 P.3d at 886–887. *Worsham I* decided the suicide itself was not a foreseeable event by Defendants—or really by Scroggs—[*id.,* 2004 OK CIV APP 2, ¶ 20, 83 P.3d at 886] and that it was not Scroggs' conduct that brought about any delirium or insanity decedent might have been suffering from when he committed suicide. *Id.,* 2004 OK CIV APP 2, ¶ 23, 83 P.3d at 887. Thus, *Worsham I* held Defendants could not be held liable for the suicide, i.e., they were not subject to liability in a wrongful death action. *Id.,* 2004 OK CIV APP 2, ¶ 24, 83 P.3d at 887.

¶ 27 This Court has stated:

The settled-law-of-the-case doctrine bars relitigation of issues that have been settled by a previous appellate opinion in the same case. Generally, all issues resolved by an appellate decision either expressly or impliedly become the law of the case and are the correctness of the trial court's judgment as to not subject to review in a subsequent appeal.

*Shoemaker v. Estate of Freeman,* 1998 OK 17, ¶ 15, 967 P.2d· 871, 875. (citations omitted). The law of the case doctrine is recognized as needed to insure an end to litigation and without it, appellate courts would spend inordinate amounts of time going over ground previously covered. *Matter of Estate of Severns,* 1982 OK 64, 650 P.2d 854, 856.

¶ 28 In their two appellate briefs to this Court (March 14 and May 18, 2005), Plaintiffs do not respond to the law of the case ruling of the trial court nor does either brief cite any authority supportive of the proposition an exception to application of the doctrine is warranted in regard to the wrongful death claim disposed of in *Worsham I.* In light of the failures to respond to the law of the case ruling or to cite any authority supporting an exception to application of the doctrine, we believe we would be warranted in determining that Plaintiffs have waived any attack as to the trial court's ruling as to the reassertion on remand of the wrongful death claim, i.e., that the claim was foreclosed in view of the decision in *Worsham I* and the law of the case doctrine. *See DLB Energy Corp. v. Oklahoma Corp. Comm'n,* 1991 OK 5, 805 P.2d 657, 659 n. 6 (issues not briefed are waived) and *Anderson v. Dyco Petroleum Corp.,* 1989 OK 132, 782 P.2d 1367, 1379 (issues not supported by argument and authority are waived).

■ ¶ 29 However, we realize that both of Plaintiffs' appellate briefs, in essence, attempt to persuade us the *Worsham I* decision was mistaken in its ruling on the wrongful death claim. An exception to application of the law of the case doctrine is recognized by our jurisprudence when the prior decision is palpably erroneous and this Court is convinced failure to reverse the earlier decision will result in a gross or manifest injustice. *Tibbetts v. Sight 'n Sound Appliance Centers, Inc.,* 2003 OK 72, ¶ 16, 77 P.3d 1042, 1050. We must note that such an exception to the law of the case doctrine is one of limited application and we do not view it as license to review otherwise final appellate disposition of those matters.

decisions, except in the most extreme circumstances.

¶ 30 Assuming Plaintiffs have not waived challenge to the trial court's law of the case ruling on the wrongful death claim, our review of *Worsham I*, the record presented in this matter and the appellate briefs submitted do not show the decision in *Worsham I* as to the wrongful death claim is palpably erroneous. Further, nothing has been presented for our review that convinces us a gross or manifest injustice will result by allowing *Worsham I's* decision foreclosing the wrongful death claim to stand. The wrongful death claim is, thus, foreclosed by the law of the case doctrine and the trial court did not err in so ruling.

**THE TRIAL COURT DID NOT ERR BY EXCLUDING THE TESTIMONY OF PLAINTIFFS' EXPERT AS TO THE ISSUE OF FACTUAL PROXIMATE CAUSE, WITHOUT WHICH PLAINTIFFS FAILED TO SHOW ANY DAMAGES FOR PRE–SUICIDE EMOTIONAL DISTRESS SUFFERED BY EITHER DECEDENT OR RAE WERE PROXIMATELY CAUSED BY ANY WRONGFUL CONDUCT OF DEFENDANTS**

¶ 31 In *Manley v. Brown*, 1999 OK 79, 989 P.2d 448, the elements necessary to be shown in a legal malpractice case are set forth as follows:

The plaintiff in a legal negligence action must prove (1) the existence of an attorney-client relationship, (2) breach of a lawyer's duty to the client, (3) facts constituting the alleged negligence, (4) a causal nexus between the lawyer's negligence and the resulting injury (or damage) and (5)

but for the lawyer's conduct, the client would have succeeded in the [underlying] action.

*Manley*, 1999 OK 79, ¶ 8, 989 P.2d at 452. (footnote omitted; emphasis deleted). In the First Syllabus by the Court in the case of *Collins v. Wanner*, 1963 OK 127, 382 P.2d 105, the Court stated: "[t]o authorize a recovery in damages against an attorney for negligence, not only must negligence be established, but it must also appear that injury resulted to the plaintiff from such negligence." Where the client claims the attorney was negligent in connection with litigation, the client must generally carry the burden to show that but for the negligence complained of the client would have been successful in the action in question. *See Sutton v. Whiteside*, 1924 OK 189, 222 P. 974. *Sutton* recognized that in an action against an attorney by a former client for negligence in failing to perfect an appeal to this Court in the underlying action, a replevin suit, it must be adequately shown that had the appeal been properly perfected from an adverse judgment against the former client in the replevin suit, this Court would have reversed the adverse judgment.

¶ 32 A finding of proximate cause must be based on something more substantial than mere speculation and conjecture. *See Gillham v. Lake Country Raceway*, 2001 OK 41, ¶ 8, 24 P.3d 858, 860. A legal malpractice/professional negligence case is no exception to this requirement. As to the proffered testimony of Dr. Smith, Plaintiffs sought its presentation as to the "but for" consequences of Defendants' acts and/or omissions, i.e., the "cause in fact" prong of proximate cause.[9] As succinctly stated in

---

9. A good summarization of the two elements of the proximate causation equation and then a more detailed recitation of the cause in fact prong thereof is contained in the case of *McKellips v. Saint Francis Hosp., Inc.*, 1987 OK 69, 741 P.2d 467. There, the Court said the following:

Proximate cause consists of two elements: cause in fact and legal causation. Legal causation concerns a determination whether legal liability should be imposed as a matter of law where cause in fact is established and depends upon considerations of common sense and policy. Cause in fact, on the other hand, deals

with the 'but for' consequences of an act. 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct.' The present matter involves only the question whether appellees or the decedent's underlying condition was the real cause— cause in fact—of his death. Therefore, our opinion does not deal with the scope of proximate cause involved in the concept of legal causation. Generally, the question of cause in fact is for the jury. It is only when there is no evidence from which the jury could reasonably find a causal nexus between the negligent act

*Hardy v. Southwestern Bell Telephone Co.,*
1996 OK 4, 910 P.2d 1024: ·

> While absolute certainty is not required, mere possibility of causation is insufficient. When the matter is one of pure speculation or conjecture or the probabilities evenly balanced, it is the duty of the court to direct a verdict for defendant because a party will not be permitted to recover from another whose acts, however wrongful, are not the proximate cause of the injury suffered.

*Id.,* 910 P.2d at 1027.[10]

 ¶ 33 Plaintiffs' position in the trial court was, in effect, that to show factual proximate cause it was **unnecessary** to prove that it was more probable than not that decedent would have been entitled to some type of court order prohibiting the perceived workplace harassment had such a case been filed on decedent's behalf by Defendants. In other words, Plaintiffs, through the testimony of Dr. Smith sought to sidestep or bypass having to carry the burden to prove that decedent would have been entitled to some type of TRO, preliminary/temporary injunction and/or permanent injunction to stop the perceived harassment from co-workers to make out a case for the recovery of damages for the emotional distress of either decedent or Rae allegedly suffered pre-suicide and arising from the continuation of the harassment. In a brief entitled Plaintiffs' Supplemental Trial Brief Responding to Defendants' Supplemental Brief Regarding Contract Damages, Negligent Infliction of Emotional Distress, and the Effect of Plaintiff's [sic] Settlement of the PSO Civil Suit, filed in the trial court on May 12, 2004 (Original Record-pp. 679–689) at pp. 5–6 thereof Plaintiffs made their position clear by stating the following:

> Plaintiffs' proof is that the mere filing of the civil suit to stop the harassment would have been sufficient to accomplish this purpose. Plaintiffs do not contend that it would have been necessary to completely adjudicate the civil case and, consequently, the Plaintiffs do not rest their claims on the outcome of that civil case (had one been filed).

¶ 34 We have no doubt that normally in a legal malpractice case based upon the former client's assertion that the purpose of the representation was to assist in stopping alleged workplace harassment, i.e., assistance in obtaining some form of prohibitory or injunctive-type relief for the client, to recover damages for the lawyer's acts or omissions in breach of the lawyer's duty to the client, it must be shown through the presentation of expert witness testimony that it was more probable than not that some form of injunctive-type relief would have been obtained in a court proceeding, but for the attorney's failings. *See Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.,* 25 Mass.App.Ct. 107, 515 N.E.2d 891, 895–896 (expert testimony necessary to show causation element in legal malpractice case in form of showing that clients probably would have been entitled to TRO under certain statutory criteria to prohibit labor picketing of restaurant where the pertinent malpractice alleged was

and the resulting injury it becomes a question of law for the court.

The sufficiency of the evidence to show cause in fact presents a question of law for the court. Sufficiency of evidence is the 'legal standard which is applied to determine whether the case may go to the jury.' A plaintiff's burden of proof of causation is twofold. First, a plaintiff has the burden of producing evidence, satisfactory to the judge, that a reasonable person could believe in the existence of the causal link and that the evidence should be weighed by the jury. A verdict will be directed for the defendant if a plaintiff fails to carry this burden. Secondly, a plaintiff bears the burden of persuasion should the evidence be allowed to reach the jury. The standard for sufficiency of proof of evidence, related to a plaintiff's first burden, should not be confused with the standard of proof, associated with a plaintiff's second burden, which is applied by the jury in reaching a final verdict. Generally, in civil cases the standard of proof means a preponderance of the evidence.....

*McKellips,* 741 P.2d at 470–471. (footnotes omitted).

**10.** The Court made clear in the First Syllabus by the Court in *Phillips Petroleum Co. v. Robertson,* 1952 OK 60, 247 P.2d 501: "[i]n a suit for damages for personal injuries, although the defendant may be shown to have been negligent in some manner, yet, unless the negligence so shown was the proximate cause of the injury complained of, no recovery can be had on account of such negligence."

abandonment by lawyers of attempt to obtain TRO unless clients paid an additional $1,000).[11] In our view, the opinion testimony of Dr. Smith fell short of being a substitute for such evidence and the trial court did not err by ruling, in substance, that Dr. Smith's testimony was unreliable.

¶ 35 Plaintiffs' challenge to the ruling excluding Dr. Smith's testimony is, in essence, that the trial court mistakenly and rigidly applied the four factors listed in *Christian v. Gray*, 2003 OK 10, ¶ 8, 65 P.3d 591, 597–598 and taken from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–594, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that Plaintiffs assert are appropriate for gauging the reliability of scientifically-based expert testimony, but not expert testimony of someone like Dr. Smith that based his conclusions/opinions on personal knowledge and experience in the human resources field.[12] The four factors as set out in *Gray* are:

1. Can the theory or technique be, or has it been, tested; 2. Has the theory or technique been subjected to peer review and publication; 3. Is there a 'known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation;' and 4. Is there widespread acceptance of the theory or technique within the relevant scientific community.

*Id.*, 2003 OK 10, ¶ 8, 65 P.3d at 597–598, citing and quoting *Daubert*, 509 U.S. at 593–594, 113 S.Ct. 2786.

¶ 36 In *Gray*, of course, we made it clear that the *Daubert* factors were intended to be flexible and were not intended to be a rigid standard applicable to every case. In *Gray* is found the following:

11. Although expert witness evidence may not be necessary in every legal malpractice action on the issue of the "but for" or cause in fact element, the instant case is one where such evidence or testimony was necessary. We have no occasion in the circumstances of this case then to delineate the circumstances or situations where expert testimony might not be necessary.

12. In their March 14, 2005 brief in chief, Plaintiffs also briefly question the trial court's allocation of the burden of proof at the hearing on the admissibility of Dr. Smith's testimony held im-

In *Kumho Tire Co., [Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ], the [United States Supreme] Court explained that a trial court has some latitude in applying the *Daubert* factors of reliability: 'Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.' *Kumho*, 526 U.S. at 153, 119 S.Ct. 1167.... Thus, the *Daubert* factors are not a rigid standard applicable in every case.

The *Daubert* factors 'may' bear on a judge's gatekeeping determinations, however. The four *Daubert* factors 'may or may not be pertinent'; it will all depend 'on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' Determining which factors are indicative of reliability in a particular case cannot be accomplished solely by a[sic] categorical a priori characterizations about the particular field in question. The Court explained: 'Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases.... In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.' In all cases, a court must exercise its gatekeeping obligation so that the expert, whether relying on 'professional studies or personal experience,' will, when testifying, employ 'the same level of intellectual rigor' that the expert would use outside the courtroom when working in the relevant discipline.

Federal Judicial Center, *Reference Manual on Scientific Evidence,* 19 (2d ed.2000), quoting, *Kumho, supra.*

mediately before the scheduled trial. No argument or authority is contained in either that brief or in the May 18, 2005 combined reply brief and answer brief submitted by Plaintiffs in support of a reversal of the trial court's decision to exclude Dr. Smith's testimony on the basis of Plaintiffs' questioning the propriety of the trial court's allocation as to the burden of proof. We do not consider the issue. *See Anderson v. Dyco Petroleum Corp.,* 1989 OK 132, 782 P.2d 1367, 1379 (issues not supported by argument and authority are waived).

A trial court must thus make a determination of the appropriate factors of reliability for the particular controversy before it based upon the nature of that controversy. *Gray,* 2003 OK 10, ¶ 13, 65 P.3d at 600. We also recognized in *Gray:*

The [United States Supreme Court] has stated that a trial court must make a determination of the reliability of an expert's evidence when it is sufficiently challenged. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.' *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. at 149 [119 S.Ct. 1167], . . . *quoting, Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. . . .

*Gray,* 2003 OK 10, ¶ 11, 65 P.3d at 599.

¶ 37 Thus, *Gray* makes clear that in all cases where the reliability of an expert's testimony is sufficiently challenged, the trial court, in its gatekeeping role, must make a determination as to whether such evidence has sufficient indicia of reliability to be admitted for jury consideration, although the four *Daubert* factors may or may not be pertinent depending upon the nature of the issue at hand, the expert's particular expertise, and the subject of his testimony. We made it clear, however, that a trial court has a responsibility to insure that an expert's opinion on causation is something more than *ipse dixit,* i.e., "a bare assertion resting on the authority of an individual." *See Gray,* 2003 OK 10, ¶ 36 and n. 19, 65 P.3d at 607 and n. 19, quoting *Black's Law Dictionary,* 961 (4th ed.1951). In our view, notwithstanding that Dr. Smith was not a scientific expert, the trial court still had a gatekeeping role to play to gauge his testimony for reliability and the bases upon which that testimony was grounded.

¶ 38 In the instant case, at the evidentiary hearing held immediately before the scheduled trial, Dr. Smith was questioned concerning and testified to the bases underlying his ultimate opinion or conclusion. Although the trial court did attempt to gauge the reliability of Dr. Smith's testimony using, in part, the four factors listed in *Daubert,* review of the transcript of the hearing convinces us the trial court did not too rigidly apply the four *Daubert* factors and that ultimately the testimony was excluded as speculative and unreliable, and not based upon sufficient intellectual rigor that would have been used outside the courtroom in the human resources field.

¶ 39 A clear abuse of discretion standard applies as to appellate review of the admissibility of expert testimony. *Gray,* 2003 OK 10, ¶ 42, 65 P.3d at 608. In *Cities Service Co. v. Gulf Oil Corp.,* 1999 OK 14, 980 P.2d 116, *cert. dismissed,* 528 U.S. 1014, 120 S.Ct. 523, 145 L.Ed.2d 404 (1999) we stated:

A trial judge's decision to exclude evidence will not be overturned absent a *clear* abuse of discretion. 'Abuse of discretion' is the applicable standard of review regardless whether the excluded testimony is outcome-determinative. It is incumbent upon a trial judge in his/her role as the 'gatekeeper' of the evidentiary process to screen evidence, i.e., to determine its relevance and reliability.

*Cities Service Co.,* 1999 OK 14, ¶ 32, 980 P.2d at 132. (footnotes omitted; emphasis in original). In *Gray* [2003 OK 10, ¶ 43, 65 P.3d at 608, citing *Fent v. Oklahoma Natural Gas Co.,* 2001 OK 35, ¶ 12, 27 P.3d 477, 481], this Court stated, "[a]n abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." This standard, thus, may include both review of fact and law issues. *Gray,* 2003 OK 10, ¶ 43, 65 P.3d at 608. As to the factual part of the equation, abuse of discretion occurs when a trial court's factual exercise of discretion is clearly against reason and the evidence, or based on untenable grounds or is manifestly unreasonable. *Gray,* 2003 OK 10, ¶ 44, 65 P.3d at 609, quoting *Patel v. OMH Medical Center, Inc.,* 1999 OK 33, ¶ 20, 987 P.2d 1185, 1194, *cert. denied,* 528 U.S. 1188, 120 S.Ct. 1242, 146 L.Ed.2d 100 (2000). As to the legal part of the equation an abuse of discretion would occur "if the trial court is deemed to have erred with respect to a pure, simple and

unmixed question of law." *Gray*, 2003 OK 10, ¶ 43, 65 P.3d at 608, quoting *Jones, Givens, Gotcher & Bogan, P.C. v. Berger*, 2002 OK 31, ¶ 5, 46 P.3d 698, 701. A *de novo* review standard applies when the error is claimed to be one of law, such as whether the trial court applied a correct legal standard in ruling on a matter. *See Gray*, 2003 OK 10, ¶ 43, 65 P.3d at 608, citing *Scoufos v. State Farm Fire & Casualty Co.*, 2001 OK 113, ¶ 1, 41 P.3d 366, 367.

¶ 40 Dr. Smith has a PhD in consumer resource studies from Oklahoma State University (OSU), a master's degree from OSU in psychology and a bachelor's degree in sociology and communications from East Central State University. He worked for ONEOK for about twenty (27) years in the HR field and at the time of trial was employed by OSU, Okmulgee as a vice-president of student affairs and employment and/or enrollment management. To reach his opinion in the matter, in addition to his experience in the HR field, Dr. Smith reviewed portions of the suit that had been brought against PSO, the deposition of Rae Worsham and the deposition of a psychologist, who apparently treated decedent prior to his suicide. He spoke with no witnesses.

¶ 41 In effect, Dr. Smith's ultimate opinion was that there is a universal standard or procedure that HR departments follow in companies large enough to have a HR department when they are threatened with suit by an attorney or when suit is filed against such companies where the claim involves workplace harassment or hostile work environment. His view is that the universal standard is implemented primarily for the protection of the company, which might be determined negligent if the universal standard is not followed after being notified of claimed harassment. He opined that PSO would have followed the universal standard had Scroggs threatened it with suit or actually filed suit.

¶ 42 Boiled down, Dr. Smith described the universal standard or procedure as containing three steps that would be taken in the following order: 1) insulate or isolate the employee to guard the company against a claim of retaliation by putting him/her on some type of leave status or placing the employee in a different department away from the situation, 2) investigate the matter and 3) turn the results of the investigation over to legal counsel for the company. This universal standard was the way Dr. Smith was taught and it was the way the ONEOK HR department handled workplace harassment situations with the legal counsel they had. Dr. Smith also indicated the universal standard was discussed when he attended meetings, training and continuing education sessions attended by other HR professionals and he never heard any HR professional disagree that the first order of business was to insulate or isolate an employee as described above. In fact, he testified that about six or seven years prior to the trial while he was attending a meeting of the Tulsa Area Human Resources Association, some unnamed person or persons from PSO (presumably someone employed by the PSO HR department) gave feedback that PSO handled the situation like every other company did, although he admitted the discussion was fairly general and, as we understand his testimony, that no one from PSO directly told him that PSO follows the universal standard he described. Dr. Smith also testified to a belief there is a standard that companies the size of PSO would follow when an employee complains of harassment, even without a lawsuit being filed. The standard would be to insulate the employee as described above, investigate the situation and then come to an intra-company disposition of the matter.

¶ 43 Our review of the testimony of Dr. Smith convinces us the trial court did not abuse his discretion by excluding the testimony as unreliable. Dr. Smith admitted he did not know what official with PSO would make the decision to isolate or insulate an employee as he described once a lawsuit was filed. Although, in effect, he thought it would be the vice-president of HR, he admitted that PSO HR personnel might only play an **advisory** role in the process. He did not know how many times PSO had been sued for harassment or how it actually handled such cases. Dr. Smith also understood from his review of materials (apparently from either the instant case or the

PSO litigation) that an investigation had actually been done by PSO as to the harassment situation, an understanding at odds with Rae's testimony that she was aware of no investigation conducted by PSO into the workplace harassment situation. That Dr. Smith himself testified to his understanding that an investigation had been done by PSO also seems to severely undercut his view that the first order of business is to insulate or isolate the involved employee from the claimed offending co-workers, rather than the first order of business being an investigatory stage for the company to make determinations concerning the credibility of the employee's claims and to make an initial assessment on how best to respond to the situation and claims.

¶ 44 Dr. Smith could point to no articles giving statistics or data as to how companies the size of PSO actually handle employment harassment cases. Nor had he read any studies in relation to the universal standard he espoused. He also testified his opinion as to the universal standard need not be based on any statistics or studies because that standard is the responsible approach and the universal approach. Further, although Dr. Smith attended meetings, seminars and continuing education where the universal standard he espoused was discussed, we do not view his testimony as indicating that he actually had any personal knowledge or experience, in a hands on way, of how other large companies handled harassment situations upon being threatened with suit or upon the filing of suit. In other words, his purported knowledge essentially came from the aforesaid meetings, etc., and his experience with ONEOK over the twenty-seven (27) years he was employed with that company.

¶ 45 Also, the evidence here further shows that the situation concerning decedent had already been brought to the attention of PSO officials by both decedent and Rae, but the situation, according to Plaintiffs, did not improve, a result seemingly at odds with Dr. Smith's belief of a standard followed by companies the size of PSO when the employee himself/herself complains of harassment, even without a lawsuit being filed. As also previously noted, the prior opinions in *Scroggs I* and *Worsham I* indicate that PSO had been informed by decedent he had retained counsel in regard to the matter and that a suit had been or was about to be filed regarding the workplace situation. Still apparently, the perceived workplace harassment continued, even though for some period of time decedent was placed on a paid leave of absence.

¶ 46 We simply cannot say on the record presented to us in this matter that the trial court abused his discretion in excluding, as unreliable, the testimony of Dr. Smith or that the decision was based either on an erroneous conclusion of law or has no rational basis in the evidence presented on the question. The record here is clear that Dr. Smith does not know who within the hierarchy of PSO makes the final decision as to how to handle threats of suit or actual suit. He also admitted that the HR department of PSO might simply play an advisory role in such a situation. He also impliedly recognized that the legal department might become involved. His testimony also seemed to be based on his view that the universal standard he discussed was somewhat of an aspirational standard in the HR field that he viewed as the responsible approach companies should follow.

¶ 47 Without the testimony of Dr. Smith we can find no evidence presented at the non-jury trial of this matter that any act or omission of Defendants can be said to have proximately caused any pre-suicide emotional distress suffered by either decedent or Rae. Plainly, no evidence was there presented or sought to be presented to show that it was more probable than not that decedent would have been entitled to some type of court-ordered injunctive relief to show that Defendants failures were the "but for" cause of any emotional distress so suffered prior to decedent's suicide. To say that the mere threat of suit or the mere filing of suit would have accomplished the desired result, the testimony sought to be presented through the testimony of Dr. Smith, because large companies seek to protect themselves from claims that they have been negligent is, in our view, devoid of sufficient indicia of a reliable methodological basis and too slender a reed to replace what would normally have

to be shown in a case such as this, to wit: that the employee would have been entitled to some type of court-ordered injunctive relief prohibiting the alleged harassment.

¶ 48 When the question for review is whether there is a complete absence of evidence to support the causation element of an action, the issue is reviewed *de novo* and, of course, if there is an entire absence of evidence as to factual proximate causation, a defendant is entitled to a verdict or judgment in his or her favor. *See Gray,* 2003 OK 10, ¶ 44 and n. 21, 65 P.3d at 609 and n. 21. In sum, we do not find error in the trial court's ruling to exclude the opinion testimony of Dr. Smith and without that evidence Plaintiffs failed to carry their burden to show that Defendants acts or omissions were the proximate cause of any pre-suicide emotional distress damages of either decedent or Rae. The trial court's judgment as to such claim to damages is, therefore, affirmed.[13]

## THE TRIAL COURT ERRED BY FORECLOSING RAE WORSHAM'S INDIVIDUAL CLAIM, BASED ON FRAUD, TO RECOVER EMOTIONAL DISTRESS DAMAGES ALLEGEDLY SUFFERED BY HER UPON LEARNING OF APPARENT FRAUDULENT CONDUCT OF DEFENDANT SCROGGS CONCERNING THE LEGAL REPRESENTATION

¶ 49 The trial court also precluded evidence sought to be submitted by Plaintiffs that arguably would have supported the recovery of damages for emotional distress allegedly suffered by Rae in her individual capacity upon learning in or about September 1998 that Scroggs had allegedly engaged in a course of misrepresentation-type conduct concerning the legal representation for which he was hired. As we understand the record, the trial court ruled that Plaintiffs' counsel waived this claim by representations either orally or in one or more written submissions in the trial court.

¶ 50 In our view, the waiver appears partially to have been perceived by the trial court through communicatory discord between the parties and the trial court involving Plaintiffs' counsel's representation that no damages were requested in the instant suit for Scroggs' actual failure to file the wrongful death case against PSO prior to Defendants' termination in September 1998. Also, Plaintiffs' counsel's lack of precision in detailing this damage claim and a failure to describe or detail it at an oral argument proceeding on May 5, 2004 in part concerning the PSO settlement motion in limine matter, more than likely had a hand in leading the trial court to view the claim as waived. Our review of the record convinces us that no representation of counsel, either in written form or orally, constituted a knowing waiver of the claim. Plainly, the claim was raised well in advance of the trial and at the trial through offer of proof. We are also convinced from review of the record that Defendants were provided with adequate notice concerning the claim. Thus, the trial court erred by viewing the claim as waived. We, therefore, must briefly discuss the claim's viability and the effect thereon of the PSO settlement.

¶ 51 In *Mashunkashey v. Mashunkashey,* 1941 OK 113, 113 P.2d 190 the Court stated:

[M]ental pain and suffering alone will ordinarily constitute but an element of damages. The latter is seldom a sufficient basis upon which to predicate an action. Usually it is compensable only when made an element of damages in an action based upon a wrong which in itself is actionable. But mental pain and suffering may constitute the basis of an independent action in cases of wilful wrong of the character where mental suffering is recognized as the ordinary, natural and proximate result of such wrong.

---

**13.** Our decision that the trial court did not err in excluding the testimony of Dr. Smith and that Plaintiffs failed to carry their burden to adequately show proximate cause as to recovery of pre-suicide emotional distress damages makes it unnecessary in this case for us to delve into Plaintiffs' arguments grounded on the collateral source doctrine or rule as to such damages, argument to the effect that the trial court erred by ruling the claims in the PSO litigation and the settlement thereof were admissible as evidence in the instant case and precluded the recovery of such damages from Defendants.

*Id.,* 113 P.2d at 191. (citations omitted). *Mashunkashey* held that "fraudulently induc[ing] one to enter into a bigamous marriage contract would constitute such a wrong, and the resulting mental pain and suffering would support an independent action for damages." *Id.*

¶ 52 In the instant case, in view of the fairly unique and unusual circumstances involved here, where Defendants are not claimed to have been initially hired to recover any pecuniary (i.e., monetary) relief for decedent or Rae Worsham, but to assist in preventing a claimed ongoing wrong that was resulting in mental pain and anguish, and then Scroggs is alleged to have engaged in a course of fraudulent conduct to cover up his failures in regard to the representation for which Defendants were asserted to have been hired, a trier of fact may be warranted in viewing the situation as one where the ordinary, natural and proximate result of Defendants' claimed wrongdoing would be one where Rae Worsham would suffer compensable emotional distress **upon learning** of the fraudulent conduct. Further, as we view this claim it seeks recovery for Rae's emotional distress additional to, separate from and different than that claimed against PSO for the wrongful death of decedent or for the pre-suicide emotional distress of either Rae or decedent resulting from the workplace harassment. The claim is based on the purported wilful conduct of Scroggs which is separate from any claim that might have been involved in the PSO litigation or settlement thereof. Therefore, the amount recovered from PSO would not, in our view, be admissible at trial to somehow reduce the amount of damages recoverable by Rae in regard to this fraud claim.

¶ 53 Although the PSO settlement recovery in regard to the above fraud claim of Rae in her individual capacity does not appear to fit neatly into our previous cases concerning the collateral source doctrine or rule, we believe that, at a minimum, by analogy the PSO settlement may not be used at trial to reduce the damages recoverable for such claim, should Rae adequately show entitlement thereto. The collateral source doctrine in its basic form was set out by this Court in

*Denco Bus Lines, Inc. v. Hargis,* 1951 OK 11, 204 Okla. 339, 229 P.2d 560 as follows:

> Upon commission of a tort it is the duty of the wrongdoer to answer for the damages wrought by his wrongful act, and that is measured by the whole loss so caused and the receipt of compensation by the injured party from a collateral source wholly independent of the wrongdoer does not operate to lessen the damages recoverable from the person causing the injury.

*Id.,* 229 P.2d at 561 (Second Syllabus by the Court). *See also Kimery v. Public Service Co. of Okla.,* 1977 OK 60, 562 P.2d 858 (evidence of a surviving spouse's remarriage inadmissible at trial to mitigate damages in a wrongful death action). As to Rae's individual fraud claim the PSO settlement recovery would, in our view, constitute compensation independent of the alleged wrongdoers, i.e., Defendants, and, in fact, as noted above, is separate from and different than the damages sought by Rae's individual fraud claim, such claim itself being separate from any claim involved in the PSO litigation. Thus, even if one assumes it is not the collateral source doctrine that would bar the admissibility of the PSO settlement in an effort to somehow reduce the amount of damages potentially recoverable by Rae in regard to this fraud claim, the separate nature of the claim and the damages sought therefore would lead to the same result as would applicability of the collateral source doctrine. In other words, the PSO settlement would not be admissible at trial to reduce the damages potentially recoverable as to the claim.

**SUMMARY**

¶ 54 In view of *Worsham I,* the law of the case doctrine foreclosed the claim sought to be reasserted against Defendants upon remand for the wrongful death/suicide of decedent. In that the trial court did not err in precluding, as unreliable, the testimony of Plaintiffs' expert on the issue of factual proximate causation and Plaintiffs failed to show that had a case been filed to stop the perceived harassment decedent was purportedly experiencing at work from co-workers, it was more probable than not that said case would have successfully resulted in some type of

injunctive relief ordering the harassment to cease, Plaintiffs failed to make out a case to recover for pre-suicide emotional distress allegedly suffered by either decedent or Rae Worsham. Thus, the trial court's judgment in favor of Defendants as to non-liability as to such damages is not subject to reversal and is affirmed in such regard. However, the trial court erred in ruling as a matter of law that Rae Worsham individually is precluded from recovering damages for the emotional distress purportedly suffered by her upon her learning of apparent fraudulent conduct on the part of Defendant Scroggs concerning the legal representation for which he was hired. Finally, the amount recovered through the settlement with PSO is not admissible at trial upon remand to reduce the amount of damages recoverable by Rae Worsham individually in regard to this fraud claim should she adequately show entitlement thereto.

¶ 55 Accordingly, for the reasons specified in this opinion, the judgment of the trial court is **REVERSED IN PART AND AFFIRMED IN PART AND THIS CAUSE IS REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH TODAY'S PRONOUNCEMENT.**

¶ 56 WATT, C.J., WINCHESTER, V.C.J., KAUGER, EDMONDSON and TAYLOR, JJ., concur.

¶ 57 OPALA, J., concurs in result.

¶ 58 HARGRAVE, J., dissents.

¶ 59 COLBERT, J., disqualified.