. 2005 OK CIV APP 33

**FRASIER, FRASIER & HICKMAN, L.L.P., Plaintiff/Appellee,**

v.

**Robert A. FLYNN, Defendant/Appellant.**

**No. 100,019.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Feb. 15, 2005.

Certiorari Denied May 2, 2005.

---

J. Patrick Mensching, Barrow & Grimm, P.C., Tulsa, OK, for Defendant/Appellee.

Opinion by RONALD J. STUBBLEFIELD, Judge.

¶1 This is an appeal by a former law firm partner, from judgment entered on jury verdict in favor of the plaintiff law firm in its action for breach of contract, deceit and fraud. Based on our review of the record on appeal and applicable law, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 Attorney Robert Flynn (Flynn) joined the law firm of Frasier, Frasier & Hickman, L.L.P. (Frasier), as an associate attorney in 1991. He subsequently was admitted to "Class B" partnership. As a "Class B" partner, Flynn became entitled to receive a designated interest in the profits of the partnership. However, he obtained neither equity nor interest in the assets of the partnership, nor did he have the right to participate in the management decisions of the partnership. The "Class B Partnership Agreement," which Flynn executed on January 1, 1995, contained this provision:

> If the undersigned Class B Partner leaves the Partnership, any fees generated by any cases then being handled for any client of the Partnership who chooses to take his case with the departing Class B Partner shall be divided between the Partnership and the departing Class B Partner according to the respective amount of work performed for the client on the case before the client left the Partnership versus the amount of work performed thereafter; provided that, in no case shall the Partnership's portion of the fee be less than one half (½) of the total fee in a contingent fee case. In any case handled in whole or in part by the undersigned Class B Partner, same will agree to protect any referral fee to any non-Frasier & Frasier [1] attorney. This paragraph shall not limit Partnership's damages in case of a breach of this Agreement.

The partnership agreement also contained a non-solicitation provision, whereby Flynn

Kurt G. Glassco, McCollam & Glassco, P.A., Tulsa, OK, for Plaintiff/Appellee.

---

1. At the time Flynn became a Class B partner, the law firm was known as "Frasier & Frasier."

agreed that he would not solicit business from Frasier's active clients for a period of two years following his departure from the law firm.

¶ 3 In August 2000, Flynn informed Frasier of his intention to leave the law firm. Flynn's departure was not immediate—the parties reached an agreement whereby Flynn continued working for the firm as a contract laborer, paid on a per diem basis. By subsequent written agreement, Flynn formally withdrew from the partnership on October 11, 2000. The parties terminated the working relationship on November 6, 2000, and Flynn subsequently opened his own law practice.

¶ 4 Following his separation from the firm, Flynn continued to handle many of the pending contingency fee cases that had originated with Frasier. These were primarily workers' compensation cases, for which Flynn collected fees when he successfully concluded the cases by settlement or trial. There were some active cases, for which Frasier had advanced substantially all of the litigation expenses, which Flynn resolved just over one month after his departure from the firm.

¶ 5 When paying workers' compensation awards, insurers often issued checks made payable to the client, and to Flynn and Frasier. Flynn requested that Frasier endorse these checks, which it did. Frasier later claimed it did so with the understanding that, after distributing the funds due to the client, Flynn would retain the attorney fees and costs in a trust account, and the monies would remain there until the parties determined how to divide them. However, Flynn used the monies to operate his practice, and later denied telling Frasier that the monies would be placed in a separate trust account.

¶ 6 The parties could not agree on how to divide the generated fees. According to Flynn, as the attorney who "closed the file" he was entitled to one half of the fee generated, regardless of the proportion of post-departure services he provided, because this was "custom" in workers' compensation cases. At the same time, Flynn objected to enforcement of the fee allocation provision of

the partnership agreement because it would allow Frasier to retain no less than fifty percent of the fee recovered, even if Flynn devoted more than fifty percent of the efforts toward recovery in the case after his departure.

¶ 7 Frasier filed this action on September 10, 2001, alleging Flynn had breached the terms of the partnership agreement by (1) soliciting clients; (2) failing to divide fees recovered; and (3) failing to reimburse sums advanced. Frasier further alleged that, after he left the firm, Flynn induced Frasier to endorse checks for attorney fees by his promise that the monies would be held in trust pending the parties' agreement on how to divide them. As an affirmative defense, Flynn asserted that the fee arrangement set forth in the partnership agreement violated the fee-splitting prohibition of Rule 1.5(e) of the Oklahoma Rules of Professional Conduct, 5 O.S.2001, ch. 1, app. 3–A; was contrary to public policy; and, therefore, void and unenforceable.

¶ 8 Flynn initially asserted a counterclaim wherein he sought an accounting of all amounts due him under the partnership agreement from the date of execution until the date of his resignation. According to Flynn, although the agreement provided for his compensation at three percent of partnership profits, it did not set forth the manner in which this interest was to be calculated. Frasier later amended its petition to assert claims for fraud and punitive damages. Flynn answered the amended petition but did not reassert his counterclaim.[2]

¶ 9 Both parties filed motions seeking summary adjudication of Frasier's claim for breach of contract. Flynn continued to maintain that the attorney fee provision of the partnership agreement was not enforceable. The Trial Court denied Flynn's motion and adjudicated the contract issue in Frasier's favor. Although the Trial Court found that Flynn was liable for breach of contract, it determined that a jury should decide the amount of Frasier's damages.

**2.** Review of the "Statement of the Case" contained in the jury instructions filed of record indicates that Flynn simply denied the amount of damages claimed by Frasier.

¶ 10 Frasier subsequently filed motions in limine, seeking to prohibit any reference by Flynn at trial to the Oklahoma Rules of Professional Conduct or his defense that the fee allocation provision of the partnership agreement constituted unlawful "fee splitting or division of fees." The Trial Court sustained Frasier's motions. Earlier, the Trial Court had entered an order requiring that all unspent attorney fees ands costs that Flynn had collected in certain identified cases (a total of 145) be placed in a trust account pending resolution of the matter, with signatures of both parties required for withdrawal of any monies from the account.

¶ 11 At trial, Frasier presented testimony of two of its partners, and called Flynn as a witness. Over Flynn's objection, the Trial Court allowed Frasier to present the testimony of an experienced workers' compensation attorney, Tony Laizure, who gave his expert opinion regarding the amount of fees Flynn owed Frasier. Flynn moved for a directed verdict, again claiming the fee division was void, but also claiming that the expert's testimony regarding the amount of "work performed" by Frasier on the 145 cases prior to Flynn's departure was unreliable.[3] The Trial Court denied Flynn's motion. Flynn presented neither witnesses nor exhibits.

¶ 12 The jury returned a verdict in favor of Frasier, awarding actual damages of $450,000. The jury also found clear and convincing evidence that Flynn had acted intentionally, with malice, and in reckless disregard of others' rights. It awarded punitive damages in the amount of $50,000. Flynn appeals from judgment entered on the jury verdict.

## DISCUSSION OF ISSUES

### I. The Partnership Agreement

¶ 13 In his first proposition of error, Flynn asserts that the Trial Court erred as a matter of law in determining that the fee allocation provision of the partnership agreement was enforceable. Flynn claims this provision of the partnership agreement violates the Oklahoma Code of Professional Re-

sponsibility because it apportions fees between lawyers not in the same firm without client consent and without regard to the degree of responsibility assumed for the continued representation. The Trial Court's legal conclusion on this issue stands before us for *de novo* review. When reexamining a trial court's legal rulings, this Court exercises plenary, independent and non-deferential authority. *Booth v. McKnight*, 2003 OK 49, ¶ 12, 70 P.3d 855, 860.

¶ 14 Flynn correctly asserts that Oklahoma courts will not aid in the enforcement of an agreement that is unlawful or the object of which is contrary to public policy. Such agreements are void and unenforceable. *Webster v. McFadden*, 1942 OK 192, 125 P.2d 987; *see also* 15 O.S.2001 § 104. However, despite Flynn's assertion to the contrary, we do not find that the provision of the partnership agreement at issue violates public policy as embodied in the Oklahoma Rules of Professional Conduct.

¶ 15 Rule 1.5(e) of the Oklahoma Rules of Professional Conduct provides:

A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all of the lawyers involved; and

(3) the total fee is reasonable.

5 O.S.2001, ch. 1, app. 3–A.

¶ 16 The parties do no direct us to any Oklahoma decision directly on point, but we have reviewed several cases wherein courts of other jurisdictions determined that similar agreements did not violate the Rules of Professional Conduct. For example, in *Tomar, Seliger, Simonoff, Adourian & O'Brien, P.C. v. Snyder*, 601 A.2d 1056 (Del.Super.Ct.), *appeal refused*, 571 A.2d 788 (Del.1990), the Court examined an agreement reached between an attorney and law firm, while the

---

3. Counsel for Flynn argued to the Trial Court: "[P]laintiff's damage claim is limited to half the amount of fees it proves have been paid to Mr. Flynn."

attorney was still a partner with the firm. The agreement provided that the firm would transfer certain contingent fee cases to the attorney upon his leaving the firm and that he would pay the firm one third of all fees he received in connection with the cases. The Court held that the agreement did not violate the Delaware Lawyers' Rules of Professional Conduct concerning fee splitting and was valid and enforceable. *Id.* at 1059.[4] The Court rejected the departing attorney's arguments that the agreement violated the ethical rule that fees must be divided in proportion to services rendered in the case and that the client had to be informed of the fee agreement. The Court in *Tomar* noted that the contingent fee cases the departing attorney continued to handle had originated with the firm while the attorney was either an associate or a partner, and there was no "brokering of legal services" such as Rule 1.5(e) was designed to prevent. *Id.* The Court reasoned:

> By its own terms, Rule 1.5(e) does not apply to lawyers who are in the same firm. It has no application to this case as there is obviously no issue with regard to brokering of legal services....
>
> It is not uncommon for a law firm and a departing attorney to divide the fees resulting from contingent fee cases which the attorney has been handling and will continue to handle after he leaves....
>
> Furthermore ... the clients did not have to be informed of the fee agreement because they were not affected by it in any way.... [T]his fee agreement was simply a part of the overall process of the lawyer's separation from the firm.

*Id.* (citing *La Mantia v. Durst*, 234 N.J.Super. 534, 561 A.2d 275 (Ct.App.Div.1989), and *Baron v. Mullinax, Wells, Mauzy & Baab, Inc.*, 623 S.W.2d 457 (Tex.Ct.App.1981)). *See also McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 197 Mich.App. 282, 494 N.W.2d 826 (1992)(agreement mandating that a percentage of fees obtained by a departing attorney for former firm cases be given to the firm as a way to compensate the firm for its work was found not void as against public policy); *Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 362 N.J.Super. 350, 827 A.2d 1163 (Ct.App.Div. 2003)(fee-division provision of partnership agreement requiring withdrawing partner to share 50 percent of contingent fees recovered was enforceable); Restatement (Third) of The Law Governing Lawyers, § 47 cmt. g (2000).[5]

¶ 17 More recently, in *Walker v. Gribble*, 689 N.W.2d 104 (Iowa 2004), the Iowa Supreme Court examined a settlement agreement reached between a lawyer and her former partner regarding division of several lucrative contingent fee cases. The case was before the Court on the lawyer's appeal from summary judgment granted in favor of the former partner. The lawyer, making arguments virtually identical to those made herein by Flynn, claimed the agreement she had reached with her former partner was void because it violated the Iowa Code of Professional Responsibility for Lawyers. *Id.* at 108. The Iowa Supreme Court disagreed, and after finding that clients were not affected by the agreement, determined: "Nothing in the parties' settlement agreement runs afoul of the Iowa Code of Professional Responsibility for Lawyers. It does not violate public policy. It is enforceable." *Id.* at 116.

¶ 18 We note that Iowa's equivalent to Oklahoma Rule of Professional Conduct 1.5(e) includes this additional provision:

> (B) This disciplinary rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement.

Iowa Code of Professional Responsibility DR 2–107. Oklahoma's former DR 2–108(B), 5 O.S. Supp.1987, ch. 1, app. 3, was identical to this Iowa provision. Oklahoma's Code of Professional Responsibility was superceded in 1988, when the Oklahoma Rules of Professional Conduct were first adopted. · *See* 5 O.S. Supp.1988, ch. 1, app. 3–A. Rule 1.5(e) of the American Bar Association's (ABA)

---

**4.** The Court in *Tomar* applied Delaware Rule 1.5(e), which contains language identical to the Oklahoma Rule.

**5.** .This section, entitled "Fee–Splitting Between Lawyers Not In The Same Firm," is identical to Oklahoma's Rule 1.5(e).

Model Rules of Professional Conduct, from which Oklahoma Rule 1.5(e) is derived, no longer contains the exclusion regarding "payment to a former partner or associate pursuant to a separation or retirement agreement." However, the official commentary to ABA Model Rule 1.5(e) provides: "Paragraph (e) does not prohibit or regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm." Model Rules of Prof'l Conduct R. 1.5(e), cmt. 8 (2003). Courts of other jurisdictions with a legislative history similar to Oklahoma's have found "nothing ... that would indicate that the deletion of this exclusion was intended to make the fee division rule applicable to the division of fees for pending matters between law firms and departing attorneys." *Piaskoski & Assocs. v. Ricciardi*, 2004 WI APP 152, ¶ 28, 275 Wis.2d 650, 686 N.W.2d 675, 686. *See also Norton Frickey, P.C. v. Turner, P.C.*, 94 P.3d 1266, 1268–69 (Colo.Ct.App. 2004).

¶ 19 We find the authorities set forth above persuasive. We conclude that Rule 1.5(e) of the Oklahoma Rules of Professional Conduct does not prohibit a law firm from sharing fees with a former partner under a separation agreement for work arising from matters that were entrusted to the firm before the partner's departure. There is no evidence herein that the Frasier clients, who followed Flynn upon his departure, were in any way prejudiced by the parties' agreement. They all had signed contracts employing the Frasier firm, each of which contained an attorney fee agreement.[6] Flynn's arguments regarding the alleged adverse effect on clients and disincentive to provide zealous representation are without evidentiary support in the record and totally unpersuasive.

¶ 20 We conclude that the fee division provision of Frasier's partnership agreement is neither illegal nor contrary to the public interests promoting Rule 1.5(e), but instead is valid and enforceable. In view of the undisputed evidence that Flynn violated the provision, we find that the Trial Court did not err in adjudicating, as a matter of law, Flynn's liability for breach of the partnership agreement.

## II. Admission of Expert Testimony Regarding Fee Division

¶ 21 For his second and final proposition of error, Flynn claims that the Trial Court erred in allowing attorney, Tony Laizure, to testify as an expert witness regarding damages and particularly, as set forth in the partnership agreement, regarding "the respective amount of work performed for the client on the case before the client left the Partnership versus the amount of work performed after." Flynn asserts that Laizure's testimony was inadmissible because the term "work" is not defined in the agreement and he had no "verifiable mathematical formula for arriving at the split amounts." Therefore, according to Flynn, Laizure's testimony was based on speculation, failed to satisfy the *Daubert* criteria, and was unreliable and inadmissible. The *Daubert* standard derives from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

¶ 22 In *Christian v. Gray*, 2003 OK 10, 65 P.3d 591, the Oklahoma Supreme Court adopted the *Daubert* standard, which provides for specific factors to be used in determining whether expert opinion evidence is scientifically valid and reliable.[7] Under the *Daubert* standard, the trial judge is to examine the relevance and reliability of the proffered evidence. "The inquiry is a flexible one, and focuses on the evidentiary relevance and reliability underlying the proposed

6. It has been noted that "[c]lients dealing with a firm usually know that the work and payment will probably be divided. In some firms, much of the fee will go to the lawyer who secures the case rather than to the lawyers doing the work." Restatement (Third) of The Law Governing Lawyers, § 47 cmt. g (2000).

7. The factors include: "1. Can the theory or technique be, or has it been, tested; 2. Has the

theory or technique been subjected to peer review and publication; 3. Is there a 'known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation;' and 4. Is there widespread acceptance of the theory or technique within the relevant scientific community." *Christian* at ¶ 8, 65 P.3d at 597–98 (quoting *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786).

submission, and not on the conclusions they generate." *Id.* at ¶ 8, 65 P.3d at 598 (citation omitted). Where an expert's "factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at ¶ 11, 65 P.3d at 598 (citation omitted).

■ ¶ 23 The Oklahoma Supreme Court has explained that "the *Daubert* factors are not a rigid standard applicable in every case," and whether the factors are, or are not reasonable measures of reliability in a particular case is a matter that " 'the law grants a trial judge broad latitude to determine.' " *Christian* at ¶ 13, 65 P.3d at 600 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). However, "[i]n all cases, a court must exercise its gate keeping obligation so that the expert, whether relying on 'professional studies or personal experience,' will, when testifying, employ 'the same level of intellectual rigor' that the expert would use outside the courtroom when working in the relevant discipline." *Id.* (citation omitted.) Therefore, a trial judge must make a determination of the appropriate factors of reliability based upon the nature of the controversy before it.

■ ¶ 24 At trial herein, counsel for Flynn began his opening statement as follows:

Let me start with saying there is money owed on the contract. There's no question that there's money owed on the contract. The question is how much.

. . . .

The amount of money. How much? It's probably more than $340,000. How much more? Nobody really knows.

Frasier offered the testimony of attorney Laizure as an expert to assist the jury in determining this issue—how much was owed under the contract. At the time of trial, this witness was President–Elect of the Oklahoma Trial Lawyers Association. A partner in another law firm, Laizure had twenty-three years experience as a plaintiff's personal injury attorney. For many of those years, a substantial portion of his practice had in-

volved workers' compensation cases. He estimated he had handled "thousands" of those cases over the years.

¶ 25 Laizure explained the typical progression of different types of workers' compensation cases through the court system, providing details regarding the services performed by an attorney and expenses which would be advanced/incurred to either settle the case or take it through trial. He explained that claimants' attorneys ordinarily do not keep contemporaneous time records when handling contingent fee workers' compensation cases because the judge trying the case sets the fee when awarding benefits. For each client originating with Frasier, Laizure examined the nature of the claim, court records, and firm records. He considered the time period during which Frasier had represented the client, and compared it to the amount of time Flynn represented the client before concluding the case, noting several instances where Flynn had settled cases shortly after leaving the firm. Drawing upon his experience handling workers' compensation cases, Laizure concluded that, pursuant to the partnership agreement, Flynn owed Frasier $487,463.80 in recovered fees. The jury's damage award was $450,000.

■ ¶ 26 Laizure may properly be considered an expert. Experienced practitioners can be deemed experts in their field of practice, and may render opinions on the competence and value of services performed by other practitioners. *See, e.g., Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 56 (2nd Cir.2000)(where special master made fee recommendation based in part on "his own experience as a practitioner").

■ ¶ 27 Applying the *Daubert* principles, we find nothing in Laizure's methods that would render his opinion unreliable and, therefore, inadmissible. His opinion was based upon the common and customary measures used by attorneys frequently practicing before the Workers' Compensation Court. It was for the fact-finder to decide whether Laizure's conclusions, based upon these practices, were to be believed. The absence of a "mathematical formula" for determining the

fee goes to the weight assigned to the evidence, not its admissibility.

¶ 28 This Court reviews for abuse of discretion a trial court's ruling on the admissibility of expert opinion. *Christian,* 2003 OK 10 at ¶ 51, 65 P.3d at 611. Based on the foregoing considerations, we find no abuse of discretion in the Trial Court's determination that Mr. Laizure's testimony was admissible.

## CONCLUSION

¶ 29 Flynn's propositions of error are not availing of reversal. We find no error in the Trial Court's rulings of which Flynn com-plains. Accordingly, the judgment entered on jury verdict must be affirmed.

¶ 30 AFFIRMED.

RAPP, V.C.J., and GOODMAN, P.J., concur.