OSCN Found Document:CARNAHAN v. CHESAPEAKE OPERATING, INC.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 CARNAHAN v. CHESAPEAKE OPERATING, INC.
2015 OK CIV APP 22
347 P.3d 753
Case Number: 110489; Comp. w/110989
Decided: 10/28/2014
Mandate Issued: 03/23/2015
DIVISION I
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION I
Cite as: 2015 OK CIV APP 22, 347 P.3d 753

 

HERB J. CARNAHAN and BETTYE M. CARNAHAN, 
Plaintiffs/Appellees,
v.
CHESAPEAKE OPERATING, INC., a Domestic for Profit 
Corporation, Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
BECKHAM COUNTY, 
OKLAHOMA
HONORABLE MICHELLE KIRBY ROPER, TRIAL JUDGE

AFFIRMED

Thomas J. McGeady, Donna L. Smith, Michael T. Torrone, LOGAN & LOWRY, 
L.L.P., Vinita, Oklahoma, for Plaintiffs/Appellees,
Kenneth H. Blakley, 
Robert D. Edinger, EDINGER & BLAKLEY, P.C., Oklahoma City, Oklahoma, for 
Defendant/Appellant.


Wm. C. Hetherington, Jr., Vice-Chief Judge:
¶1 Chesapeake Operating, Inc. (Chesapeake) appeals entry of a $234,000 
judgment following a jury verdict in favor of Herb J. Carnahan and Bettye M. 
Carnahan (Plaintiffs) in their lawsuit alleging trespass, public nuisance, and 
private nuisance arising from contamination of their land by a condensate seep 
from a gas well. Chesapeake claims improper jury instruction and admission of 
expert opinions over its objections based on Daubert v. Merrell Dow 
Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), 
resulted in a lack evidentiary support for the judgment, requiring reversal. 
Following a review of the experience and education of the challenged experts' 
qualifications under relevant factors described in Daubert, we determine 
the trial court did not abuse its wide discretion in admitting the experts' 
testimony into evidence and there is no reversible error in the jury 
instructions. The judgment entered on the jury's verdict is AFFIRMED.
FACTS
¶2 Chesapeake drilled the Bettye #1-2 Well on Plaintiffs' property in Beckham 
County, Oklahoma, in May of 2007, and the well subsequently began producing gas. 
In late December of 2007, the Oklahoma Corporation Commission (OCC) and 
Chesapeake began investigations based on Plaintiffs' report of odors indicating 
a possible leak. Chesapeake hired environmental consultants and OCC sent 
personnel to conduct tests at a spring and a seep on Plaintiffs' land. The 
testing confirmed the presence of condensate vapors. OCC's testing did not lead 
it to identify a source. In late December of 2009, Plaintiffs sued for public 
and private nuisance and trespass, alleging Chesapeake's oilfield operations had 
polluted and contaminated part of their ranch land and they were entitled to 
punitive damages.[1]
¶3 According to a November 23, 2011 Joint Stipulation Precluding The 
Presentation of Certain Evidence by Plaintiffs, Plaintiff Herb J. Carnahan, due 
to his ill health, was not deposed, he would not offer any testimony or exhibits 
at trial, and Plaintiffs' witnesses, including expert witnesses, would not rely 
on any statements made by him. Plaintiffs also agreed not to offer "any 
non-expert testimony or evidence on the computation or amount of any damages 
sought by Plaintiffs."
¶4 A Third Amended Scheduling Order provided Plaintiffs' experts not 
previously deposed were "to present material relied upon and give final opinions 
by September 1, 2011," and Chesapeake's experts were to be deposed and give 
final opinions by December 1, 2011. After Plaintiffs' experts were deposed, 
Chesapeake filed three motions in limine, all of which raised objections under 
principles set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 
U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), seeking to exclude Plaintiffs' 
three experts from testifying at trial. Chesapeake also filed a Motion for 
Summary Judgment As to Causation and Damages in which it argued that if the 
three motions in limine were granted, then Plaintiffs' claims should fail for 
lack of supporting evidence. In a separate Alternative Motion for Partial 
Summary Judgment, Chesapeake also claimed there was no evidence justifying 
punitive damages. In an Order filed on January 23, 2012, the trial court granted 
the motion for partial summary judgment regarding punitive damages and denied 
Chesapeake's three motions in limine and its Motion for Summary Judgment As to 
Causation and Damages.
¶5 The case proceeded to jury trial on January 31, 2012, February 1, 2012, 
and February 2, 2012. Plaintiffs sought over $482,000, which they contended was 
the remediation cost to clean up the natural gas condensate. Based upon the 
grounds previously cited in the denied motions in limine, Chesapeake was given a 
"continuing and running" objection to the opinions of Plaintiffs' experts so as 
to avoid disruption of the trial.[2] When Plaintiffs rested their case, Chesapeake 
demurred to their evidence, arguing, inter alia, Plaintiffs had failed to 
produce admissible evidence on every element of their theories for recovery and 
for causation, and their experts either could not identify the accepted 
scientific method relied upon for opinions or identified an accepted scientific 
method but failed to follow it. The trial court overruled the demurrer and 
Chesapeake presented its own evidence. After Chesapeake rested, it moved for a 
directed verdict, arguing Plaintiffs had produced no admissible evidence 
reasonably supporting their claims. Chesapeake contended Plaintiffs' experts 
failed to present qualified, reliable, scientific, or relevant expert opinions 
on causation, injury, or damages and the experts' testimony should not have been 
admitted at trial. After hearing argument, the trial court overruled 
Chesapeake's motion. The jury returned a verdict in favor of Plaintiffs and 
against Chesapeake in the amount of $234,000, and judgment was entered 
accordingly. This appeal followed.
STANDARD OF REVIEW
¶6 "[T]he clear abuse of discretion appellate standard applies when we review 
a decision on the admissibility of expert testimony." Christian v. Gray, 
2003 OK 10, ¶ 42, 65 P.3d 591, 608. "An abuse of 
discretion occurs when a decision is based on an erroneous conclusion of law or 
where there is no rational basis in evidence for the ruling." Spencer v. 
Oklahoma Gas & Electric Company, 2007 OK 76, ¶ 13, 171 P.3d 890, 895 (Emphasis 
omitted).
¶7 "[T]he sufficiency of the evidence to sustain a judgment in an action of 
legal cognizance is determined by an appellate court in light of the evidence 
tending to support it, together with every reasonable inference deducible 
therefrom, rejecting all evidence adduced by the adverse party which conflicts 
with it. Park v. Security Bank and Trust Company, [1973 OK 72, ¶ 21], 512 P.2d 113, 118 (Okla.1973)." 
Florafax International, Inc. v. GTE Market Resources, Inc., 1997 OK 7, ¶ 3, 933 P.2d 282, 287.
¶8 "We must affirm a jury verdict if there is any competent evidence 
reasonably tending to support it, evidence which is relevant and material to the 
issue to be determined." Ellison v. Campbell, 2014 OK 15, ¶ 14, 326 P.3d 68, 73. (Emphasis and 
footnotes omitted.) "A jury verdict is conclusive as to all disputed facts and 
all conflicting statements, where there is any competent evidence tending to 
support the jury verdict. Where a jury has tried a cause, it is the exclusive 
arbiter of the credibility of the witnesses." Id. (Footnotes 
omitted.)
¶9 "We review assigned errors in jury instructions to consider whether the 
instructions in their entirety accurately reflect the law and whether it is 
reasonably evident that the jury was mislead by an erroneous instruction." 
Gilbert v. Security Finance Corporation of Oklahoma, Inc., 2006 OK 53, ¶ 
2, 152 P.3d 165, 171. (Footnote 
omitted.) "We inquire on review whether the instructions reflect the Oklahoma 
law on the relevant issue, not whether the instructions were perfect." Myers 
v. Missouri Pacific Railroad Company, 2002 OK 60, ¶ 29, 52 P.3d 1014, 1029. (Footnote 
omitted.) "The test of reversible error in giving jury instructions is whether 
the jury was misled to the extent of rendering a different verdict than it would 
have rendered if the errors alleged had not occurred. Johnson v. Ford Motor 
Co., 2002 OK 24 ¶ 14, 45 P.3d 86, 92-93." Covel v. 
Rodriguez, 2012 OK 5, ¶ 26, 
272 P.3d 705, 716.
THE APPEAL
¶10 Summarized, Chesapeake's appeal raises two main issues for consideration. 
Chesapeake argues Plaintiffs' expert's evidence was improperly admitted, causing 
a failure of competent and sufficient evidence of causation, injury or damages, 
and the jury was not properly instructed about damages. We address these 
contentions in turn.
Expert Testimony and Daubert
¶11 Chesapeake argues the evidence provided by Plaintiffs' three experts, 
petroleum engineer Earl Gary Keen (Keen), environmental consultant Jerry James 
Black (Black), and real estate appraiser Jim R. Artman (Artman), was 
incompetent, insufficient, and inadmissible under the principles set forth in 
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 
2786, 125 L.Ed.2d 469 (1993). As a result, Chesapeake contends, the trial court 
abused its discretion by admitting the experts' opinions into evidence, 
Plaintiffs did not meet their burden of proof, and a directed verdict should 
have been entered.
¶12 Factors to consider when assessing the admissibility of expert testimony 
are set forth in cases such as Daubert and Kumho Tire Co., Ltd. v. 
Patrick Carmichael et al., 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 
(1999), both of which were explicitly adopted for application in Oklahoma civil 
actions in Christian v. Gray, 2003 OK 10, ¶ 14, 65 P.3d 591, 600.
¶13 The Kumho court held Daubert's general holding setting 
forth the trial judge's general "gatekeeping" obligation "applies not only to 
testimony based on 'scientific' knowledge, but also to testimony based on 
'technical' and 'other specialized' knowledge" and cautions Daubert's 
"list of specific factors neither necessarily nor exclusively applies to all 
experts or in every case." 526 U.S. at 141, 119 S.Ct. at 1171. The Kumho 
Court notes, 525 U.S. at 142, 119 S.Ct. at 1171, how

 
 [T]he law grants a district court the same broad latitude when it decides 
 how to determine reliability as it enjoys in respect to its ultimate 
 reliability determination. See General Electric Co. v. Joiner, 522 
 U.S. 136, 143, 118 S.Ct. 512, 139, 139 L.Ed.2d 508 (1997) (courts of appeal 
 are to apply "abuse of discretion" standard when reviewing district court's 
 reliability determination.)
(Emphasis in original.)
The objective of the gatekeeping requirement "is to insure the reliability 
and relevancy of expert testimony." Kumho, 526 U.S. at 152, 119 S.Ct. at 
1176.
¶14 In Worsham v. Nix, 2006 OK 67, ¶ 35, 145 P.3d 1055, 1067, the Court 
lists the four factors set out in Gray as:

 
 1. Can the theory or technique be, or has it been, tested; 2. Has the 
 theory or technique been subjected to peer review and publication; 3. Is 
 there a "known or potential rate of error . . . and the existence and 
 maintenance of standards controlling the technique's operation;" and 4. Is 
 there widespread acceptance of the theory or technique within the relevant 
 scientific community.
 Id., [Gray], 2003 OK 10, ¶ 8, 65 P.3d at 
 597-598,citing and quoting Daubert, 509 U.S. at 593-594, 113 S.Ct. 
 2786.
"In Gray, of course, we made it clear that the Daubert factors 
were intended to be flexible and were not intended to be a rigid standard 
applicable to every case." Id., ¶ 36, p. 1067. Whether particular 
Daubert factors are, or are not reasonable measures of reliability in a 
particular case is a matter about which the law grants a trial judge broad 
latitude to determine, and "a trial judge must make a determination of the 
appropriate factors of reliability based upon the nature of the controversy 
before it." Frasier, Frasier & Hickman, L.L.P. v. Flynn, 2005 OK CIV APP 33, ¶ 23, 114 P.3d 1095, 1102 (Approved for 
Publication by the Supreme Court).
¶15 As the Court teaches in Gray, "a Daubert challenge includes 
an initial determination of whether the expert's method is one where reliability 
may be taken for granted," 2003 OK 
10, ¶ 11, 65 P.3d at 600, but, as stated by the U.S. Supreme Court in 
Kumho, "when the evidence is not novel a trial court may make that 
determination and avoid a prolonged Daubert inquiry." 2003 OK 10, ¶ 11, 65 P.3d at 599. 
(Emphasis in original.) Citing Kumho, 526 U.S. at 153, 119 S.Ct. at 152, 
the Court in Gray noted the trial court must exercise its gatekeeping 
function to assure the reliability and relevance of an expert's testimony 
"whether relying on 'professional studies or personal experience,'" and 
to assure the expert employs "'the same level of intellectual rigor' the expert 
would use outside the courtroom when working in the relevant discipline." 
Id., ¶ 13, p. 600. (Emphasis added.)
¶16 The Worsham Court further explains, 2006 OK 67, ¶ 37, 143 P.3d at 
1068:

 
 Thus, Gray makes clear that in all cases where the reliability of 
 an expert's testimony is sufficiently challenged, the trial court, in its 
 gatekeeping role, must make a determination as to whether such evidence has 
 sufficient indicia of reliability to be admitted for jury consideration, 
 although the four Daubert factors may or may not be pertinent 
 depending upon the nature of the issue at hand, the expert's particular 
 expertise, and the subject of his testimony. We made it clear, however, that 
 a trial court has a responsibility to insure that an expert's opinion on 
 causation is something more than ipse dixit, i.e., "a bare 
 assertion resting on the authority of an individual." See Gray, 2003 OK 10, ¶ 36 and n. 19, 65 
 P.3d at 607 and n. 19, quoting Black's Law Dictionary, 961 (4th 
 ed.1951).
At the time of trial in July of 2012, 12 O.S.2011 § 2702, the controlling 
statute on the central evidentiary issue, provided: "If scientific, technical or 
other specialized knowledge will assist the trier of fact to understand the 
evidence or to determine a fact in issue, a witness qualified as an expert by 
knowledge, skill, experience, training or education may testify in the form of 
an opinion or otherwise" and 12 
O.S.2011 § 2703 provided[3]:

 
 The facts or data in the particular case upon which an expert bases an 
 opinion or inference may be those perceived by or made known to the expert 
 at or before the hearing. If of a type reasonably relied upon by experts in 
 the particular field in forming opinions or inferences upon the subject, the 
 facts or data need not be admissible in evidence in order for the opinion or 
 inference to be admitted.
We review the admissibility of Plaintiffs' experts' testimony with these 
statutes and factors in mind, along with the Gray Court's direction how, 
if sufficiently challenged, "the trial judge must determine whether the 
testimony has a 'reliable basis in the knowledge and experience of [the 
relevant] discipline.'" 2003 OK 
10, ¶ 11, 65 P.3d at 599 (citing Kumho, 526 U.S. at 149, 119 S.Ct. at 
1175, quoting, Daubert, 509 U.S. at 592, 113 S.Ct. at 2786).
Keen
¶17 Chesapeake contends Keen's opinion is based on speculation, not 
scientific proof, and he is not qualified by knowledge, skill, experience, 
training or education, rendering his gas migration opinion insufficient to 
establish causation. Chesapeake contends Keen failed to conduct additional 
testing to rule out pipelines as a source of contamination, and he admitted the 
science governing mitigation was geology, but he was not a geologist. Plaintiffs 
contend Keen did consider and eliminate other sources of contamination, 
including pipelines. They argue Keen observed the site, checked records, and 
reviewed tests, including down hole pressure tests and cement bond logs for the 
well.
¶18 According to his testimony, Keen has the experience and education 
described hereafter. He earned bachelor and master of science degrees in 
petroleum engineering at the University of Missouri at Rolla. At the University 
of Oklahoma, he earned a master of public administration degree in management 
and a master of science in environmental engineering. He did work toward but did 
not complete a doctorate in petroleum engineering. Keen was licensed in Oklahoma 
as a petroleum engineer in 1979 and as a civil engineer in 1987. He is not a 
geologist or hydro geologist, but his job requires him "to take a lot of geology 
courses."
¶19 Keen worked in the oilfield for oil companies during summers while in 
college. After earning his baccalaureate, Keen worked for about seven and a half 
years for an oil company both in the United States and overseas in water flow 
operations, reservoir work, offshore oil field development, and production work 
and drilling as an operations engineer, which also included investigating and 
determining responsibility for pollution problems. After earning his masters 
degree he was employed by Gulf Oil Company in Oklahoma City as an enhanced 
recovery engineer, an engineering sub-specialty involving fluid flow through 
porous media and deep underground pressures. When he enrolled in the Ph.D. 
program at the University of Oklahoma he was hired to teach a Blowout Prevention 
School in a program run by the School of Petroleum Engineering and the College 
of Continuing Education. He then ran his own oil control schools and gave 
classes at large and small oil companies. In the mid-1980s, when the oil 
business slowed, he quit petroleum engineering and began to work as a consultant 
on a contract basis, drafting city ordinances regulating drilling production for 
the City of Oklahoma City for about five years, for about ten years for the City 
of Edmond, and for about twenty years for the City of Choctaw, ending in 2004. 
Since 1992, Keen principally has worked as a civil engineer addressing drainage, 
parking lots, detention ponds, water mains, sewer mains, and building 
foundations. As a civil engineer he works with surface drainage, models of 
streams, and runoff calculations.
¶20 Keen also testified to his personal knowledge of the site gained after he 
was retained by Plaintiffs as an expert to investigate the source of 
contamination and to the methodology he used to reach his conclusions. He 
testified he applied his knowledge as a petroleum reservoir engineer and used 
Darcy's Law, which he testified applies to any fluid. However, he did not 
calculate any groundwater flow rates using Darcy's Law. He did not personally 
measure down hole pressures but noted Chesapeake itself did that 
measurement.
¶21 Keen considered possible sources of contamination including the Bettye 
#1-2 Well, other wells, pipelines, surface spills, and leaks from pits during 
drilling. He ruled out illegal dumping, checked records, eliminated other well 
sources, and checked for but found no documentation for onsite spills. Pits had 
been dug at the well and steel tanks had been put on liners in the pits, so he 
could not "totally rule that out" as an on-site spill location. Keen discovered 
other pipelines, except for a Chesapeake line built in 2007, are downstream from 
the seep. The Chesapeake pipeline and an Atlas pipeline were pressure tested and 
had holes dug next to them, with negative results as to leaks. The Atlas 
pipeline was closed after the pressure test and when it was blown down, it did 
not contain any liquids, only dry gas. He also went to the site and observed the 
seep. Keen saw a thin layer of hydrocarbon sheen, a "rainbow," on water in the 
creek. He testified cement bond logs indicated both good areas and questionable 
areas where the cement could be porous or have tiny cracks. Keen testified the 
cement higher than 12,500 feet from the surface is of questionable quality. He 
opined the pressure test on the Betty #1-2 Well was inconclusive on whether 
there was a small fracture in the well's surface casing or wear on the surface 
casing due to the drill string turning, the rig being out of vertical plumb, a 
slightly bent kelly, or a crooked hole in the surface casing hole. Keen advised 
the well also could have a natural fracture or have had one induced by pressures 
outside the surface casing back to the surface of the ground. Keen testified the 
mud log showed several zones of gas production above the area of good cement and 
these areas were insufficient for commercial production. He opined gas from one 
of these zones entered the well's annulus (the area between the production 
casing and the wall of the hole) and then migrated toward the surface. He did 
not have a theory that the rock was fractured before gas came into the well's 
annulus. Keen noted OCC hydrologist Shawn Coslett had earlier testified how, 
despite that a gauge indicated zero pressure, after a valve from the surface 
casing to a frac tank was opened, there was a loud noise from escaping gas and 
gas had flowed for several minutes.
¶22 Keen searched for a pipeline owned by Aquila Southwest Pipeline and was 
informed by Plaintiff Bettye Carnahan and OCC hydrologist Shawn Coslett[4] that neither 
could find an easement for such a pipeline and no surface markers or signs 
indicate its presence near the area in controversy. He concluded this pipeline 
did not exist near the contaminated area.[5] From this process of elimination, Keen was "back to 
the source of contamination being associated with this Bettye Well." In his 
opinion the contamination flow did not move through virgin rock, it had traveled 
up the wellbore until it reached the surface and then exited the wellbore. He 
testified this opinion was based on principles petroleum engineers use daily, 
not peer reviewed scientific methodologies. He described the area contaminated 
as "not a huge leak."
¶23 Applying the Daubert principles, Keen's education, experience, and 
methods do not render his opinion unreliable and therefore inadmissible. Based 
on the foregoing considerations, the trial court did not abuse its discretion 
when determining Keen's testimony was admissible.
Black
¶24 Black attended the University of Oklahoma, earned a bachelor of science 
in zoology and a master's in environmental science from the College of 
Engineering. Following graduation, he worked from 1980 to 1984 at the Oklahoma 
Water Resource Board as an enforcement officer, looking at complaints and 
conducting inspections of fish kills and laboratories. In 1984 and 1985, he 
managed a lab certification program and sent samples of unknown materials out to 
contract laboratories seeking certification. In "1984-and-a-half, almost 1985" 
he transferred to the Research and Standards section at the Oklahoma Water 
Resource Board, conducting cleaning surveys, clean-lake studies, and supervising 
the Tar Creek remediation site. In addition, he did special enforcement 
activities and was responsible for knowing safe substance levels for water for 
drinking or contact and statutory standards for some pollutants, and for 
maintaining and assuring the integrity of tests. He worked on projects setting 
up toxicity testing standardized procedures. In 1985, he started his own 
environmental consulting company, providing consulting services to companies 
needing help to come into compliance with state and federal laws, and monitoring 
sites, including Resource and Recovery Act sites and hazardous sites. He 
testified he has been qualified to testify concerning environmental remediation, 
chemical fingerprinting, and gas chromatography analysis in state and federal 
district courts.
¶25 Black was retained by Plaintiffs to look at the seepage, take samples, 
find the extent of pollution, become familiar with the area as it related to the 
seepage, and develop a remediation plan. He examined gas chromatography analysis 
generated by the Oklahoma Corporation Commission and Chesapeake. He reviewed OCC 
files before a site visit in April of 2010. He examined the spring and took 
samples of it. He walked the ravine containing the spring to a fence line. He 
did some boring 40 yards above the spring and encountered ground water polluted 
with condensate. Black took samples of sediments at different levels during the 
boring and of water found beneath the surface. He could smell oil on the spring 
and saw visual sheens on the water. The odor was strong, and he had to back out 
"every now and then" to get some fresh air. Black was on site for about seven 
hours during this site visit. He visited the site a total of five times, several 
times when Chesapeake experts also were on site.
¶26 At his business, Black keeps a running list of the rental cost of 
different types of equipment used for cleanups. For Plaintiffs' site he proposed 
cleaning it by constructing approximately 468 feet of trench; installing 
monitoring wells; doing two high pressure washes of the spring area; collecting 
the wash products and water with booms and pads; removing contaminated 
sediments; removing contaminated dirt; disposing of the contaminated dirt, wash 
water, and wash materials; testing; and restoring the area by removing the 
trench. Compared to the Tar Creek remediation, he characterized this project was 
"very small." The subtotal cost just for the stream irrigation/washing is 
"almost $100,000." He calculated the total cost of the equipment, disposal, and 
materials was $482,390.63.
¶27 Applying the Daubert factors, Black's education, experience, and 
methods do not render his testimony inadmissible due to being unreliable. The 
trial court did not abuse its discretion when determining Black's testimony was 
admissible.
Artman
¶28 Artman testified he has been a real estate appraiser for 39 years, and he 
is the owner of a real estate appraisal company. Prior to forming his company, 
he was employed during the 1970s by Sooner Federal Savings and Loan and Oklahoma 
Appraisal Company. His appraisal work is not confined to a certain area of 
Oklahoma and he has previously appraised property in Beckham County.
¶29 Artman has a bachelor of administration in mathematics and has completed 
21 hours toward an MBA degree. Starting in the 1970s, he took "numerous" courses 
in appraisal, mostly in working towards a Member Appraisal Institute 
designation, and courses, including continuing education, for State of Oklahoma 
certification. He has attended a seminar given by the Appraisal Institute on 
different factors to consider when analyzing contaminated property. Artman is a 
member of Real Estate Appraisal Data, Inc., an appraisal group in the Oklahoma 
City area, and is one of 45 appraisers appointed to the Standards and 
Disciplinary Procedures Committee for the Oklahoma Real Estate Appraisal Board. 
As a member of that committee he serves on three-member panels hearing 
grievances to determine if there is a violation of the Uniform Standards of 
Professional Appraisal Practice and to recommend discipline, fines, or 
penalties. Artman is a one of 389 Certified General Appraisers in Oklahoma and 
is qualified to appraise all types of properties.
¶30 Artman has performed 15 appraisals for diminution in value resulting from 
contamination and, in the past five years, has prepared this type of appraisal 
for lawsuits. He has appeared as an expert witness in the federal district court 
in Oklahoma City and multiple state district courts.
¶31 Artman testified Advisory Opinion No. 9 defines diminution in value as 
the difference between the unimpaired and impaired values of the appraised 
property due to increased risks or costs attributable to the property's 
environmental condition. Artman first determined the property's highest and best 
use by applying tests of what uses are physically possible, legally permissible, 
and financially feasible to ascertain the maximally productive use. He concluded 
the highest and best use of Plaintiffs' property was agricultural, i.e., 
for cultivation or ranching. He looked at eight comparable sales to value the 
land, four of which were most comparable, and other comparable sales for the 
residence on the land. He opined the unimpaired value of the land was $800 per 
acre and the residence's value was $65,000. He walked the area of contamination 
and observed a sheen of oil residue along the creek bed and dead trees and 
vegetation. Artman walked the perimeter of the property to "get an idea of the 
lay of the land" and reviewed Beckham County soil surveys, assessor records, and 
deeds. He learned the property was issued an organic farming certificate by the 
Oklahoma Department of Agriculture, Food, and Forestry in 2003. Artman testified 
he did not know the full extent of contamination or the chemicals involved, and 
he obtained the cost of remediation from Black. He testified appraisers do not 
typically have scientific or technical expertise and they routinely rely on 
experts with a background in remediation. Artman has worked with Black on six or 
seven similar occasions and considers Black reliable. He allowed that if Black's 
clean-up costs were changed, his own diminution in value appraisal would also 
change.
¶32 Artman described three effects or factors to look at to assess impaired 
value: (1) cost effect, such as deductions for remediation costs, (2) use 
effects, such as limitations or restrictions on use, and (3) risk effect, such 
as environmental risk or uncertainty or market stigma perceptions. He testified 
that Advisory Opinion No. 9 permits an appraiser to determine a diminution in 
value based solely on the costs of remediation. Using the edition of Advisory 
Opinion No. 9 in effect on December 27, 2007, the date of his appraisal, Artman 
concluded Plaintiff's 611 acre property had an unimpaired value of $554,000 
($800 per acre plus $65,000 for the house) and, using the cost effect factor, a 
diminution in value of $483,431 to the property as a whole if not cleaned up. He 
attributed the diminution to the property as a whole because it was one 
contiguous ranch. Artman concluded a willing buyer would not pay more than 
$70,659 for the property with the on site contamination in place due to the cost 
of cleanup.[6]
¶33 Chesapeake claims only OCC may require remediation and, as a consequence, 
Artman's appraisal is flawed. We reject this claim because Plaintiffs seek 
damages, not remediation itself. As to jurisdictional powers of OCC and of the 
district courts, the Court, in Meinders v. Johnson, 2006 OK CIV APP 35, ¶ 27, 134 P.3d 858, 866, explains:

 
 Clearly, and in keeping with the limited jurisdiction of the Corporation 
 Commission, the Oklahoma Supreme Court has recognized that the district 
 courts of this state possess the authority to determine private rights'[sic] 
 disputes arising from mineral production. Tenneco Oil Co.[v. El 
 Paso Natural Gas Company], 1984 OK 52, ¶¶20-23, 687 P.2d 
 [1049] at 1053-54. Indeed, there seems little doubt that only the district 
 courts of this state possess jurisdiction to award nuisance or negligence 
 damages for pollution and cleanup. Union Texas Petroleum Corp. v. 
 Jackson, 1995 OK CIV APP 
 63, 909 P.2d 131; 
 Tenneco Oil Co. v. Allen, 1973 OK 129, 515 P.2d 1391; Sheridan Oil 
 Co. v. Wall, 1940 OK 225, 
 103 P.2d 507. See also, 
 Marshall v. El Paso Natural Gas Co., 874 F.2d 1373 (10th Cir. (Okl.) 
 1989); Greyhound Leasing & Financial Corporation v. Joiner City 
 Unit, 444 F.2d 439 (10th Cir. (Okl.) 1971). And, it appears that a party 
 may pursue a damages claim in district court concurrently with a remediation 
 action before the Corporation Commission. Schneberger v. Apache 
 Corp., 1994 OK 117, 890 P.2d 847; Union Texas 
 Petroleum Corp., 1995 OK CIV 
 APP 63, ¶19, 909 P.2d at 139. Further, a successor operator may be held 
 liable for maintaining a pollution-related nuisance created by a 
 predecessor. Union Texas Petroleum Corp., 1995 OK CIV APP 63, ¶26, 909 P.2d 
 at 141.
We reject Chesapeake's OCC argument as a basis for reversal.
¶34 Applying the Daubert principles, Artman's opinion is based upon 
common and customary measures used by appraisers applying relevant industry 
guides, and he does not lack sufficient and relevant experience and education to 
form his conclusions. The trial court did not abuse its discretion by denying 
Chesapeake's request to bar Artman from testifying.
¶35 The question of the weight to be accorded the testimony of the challenged 
experts was for the trier of fact and will not be re-weighed on appeal under the 
guise of evaluating admissibility. The trial court has not been shown to have 
abused its discretion in allowing admission of the challenged testimony and 
reversal on the basis of inadmissibility is rejected.
Instructions
¶36 Chesapeake contends the jury was misled into awarding unreasonable 
damages by improper jury instructions. Chesapeake contends it "objected that the 
instructions failed to inform the jury of [its] theory of what constituted 
required and reasonable remediation." (Emphasis in original.) 
Chesapeake contends it unsuccessfully offered instruction requiring the jury to 
consider the reasonable remediation costs "in accordance with the laws, 
policies, rules, and regulations" of the State of Oklahoma and the OCC, how OCC 
has "exclusive jurisdiction over site remediation," and that OCC would determine 
whether remediation was required and what level of cleanup was needed. The trial 
court also rejected Chesapeake's proposed instruction limiting damages to a 
restricted portion of Plaintiffs' property.
¶37 "The test on review of instructions given or refused is whether there is 
a probability the jury was misled to the prejudice of the complaining party, 
Wilkerson Motor Co., Inc. v. Johnson, [1978 OK 12], 580 P.2d 505 (Okla. 1978), or a 
proper issue was excluded from the jury's consideration. Woodall v. Chandler 
Material Co., [1986 OK 4], 716 P.2d 652 (Okla. 1986)." Rogers 
v. Welltech, Inc., 1991 OK CIV APP 2, ¶ 8, 813 P.2d 534, 536.
¶38 The jury was instructed not to use speculation or guesswork and that 
their "decision must be based on probabilities, not possibilities." They were 
cautioned against double recovery both as to temporary and permanent damages and 
as to Plaintiffs' three theories of liability - trespass, public nuisance, and 
private nuisance.[7] They were instructed how permanent damage was the 
difference between "the reasonable market value of the affected property" 
immediately before and after injury and temporary damage was "the cost of 
restoring the affected property to its former condition," with compensation for 
loss of its use, and how the cost of restoration "cannot exceed the depreciated 
value of the affected property itself." They were instructed to decide if 
remediation was needed, and if it was not that no damages should be awarded, but 
if remediation was needed, then they should determine an amount of damages to be 
awarded Plaintiffs. The jury was instructed a damage award based on remediation 
"may not exceed the difference between the 'fair market value' as the term is 
used in these instructions of the affected property" before and immediately 
after "the hydrocarbons were discovered" and to determine damages based on the 
evidence using a three step process:

 
 First Step: The dollar amount which represents a) 
 the fair market value of the affected property immediately before the 
 hydrocarbons were discovered; and b) the dollar amount which 
 represents its fair market value immediately after the hydrocarbons were 
 discovered.
Second Step: The dollar amount which represents 
 the difference between a) and b) in the First Step is 
 the "diminution in the value" of the affected property, and the damages may 
 never exceed this amount.
Third Step: The dollar amount 
 which you have determined is the reasonable cost of remediating the affected 
 property.
(Emphasis in original.)
Chesapeake contends the jury was "left to conjecture about the proper 
damages" and about what area was the "affected property." Chesapeake argues the 
jury should have received its "clarification" instruction advising that 
Plaintiffs had only presented evidence that three acres of their property were 
affected. The record does not support this contention, which conflates the 
question of the physical area affected by pollution with the question of damages 
for impairment in value. At one point during Black's testimony, Chesapeake's 
counsel asked if it would be "a fair estimate to say" the area affected by 
pollution was three acres or less, to which Black answered he had not done that 
calculation. Chesapeake presented its own evidence concluding any damages 
were limited to a small area. In contrast, Plaintiffs presented evidence of 
impairment to the value of the whole property if the seep were not cleaned 
up.
¶39 Chesapeake contends the jury should have received its proposed 
instructions regarding OCC exclusive jurisdiction over site remediation, the 
cost for remediation under OCC policies, rules, and regulations, and that "the 
OCC would determine whether a remediation was required and cleanup levels to be 
achieved." As noted above, Plaintiffs sought damages, not an order for site 
remediation. The refusal of the instruction does not present reversible 
error.
¶40 The weight and credibility to be ascribed to the competing views on the 
area of Plaintiffs' property suffering an impairment in value was a question for 
the jury. Having considered the instructions given, the evidence, the issues 
raised and the instruction requested, we conclude the instructions given 
substantially covered the issues and the applicable law was adequately and 
fairly explained to the jury. Further, nothing in the record indicates the jury 
itself was confused on the issues. We conclude there was no prejudicial 
misstatement of law and no fundamental error in the instructions and the 
omission of the requested instructions do not constitute reversible error under 
the record presented. The judgment will not be disturbed due to the 
instructions.
CONCLUSION
¶41 "It is not for us to weigh the evidence. We consider all the evidence 
tending to support the verdict, together with every reasonable inference from 
it. We must affirm unless there is an entire absence of proof on a material 
issue." Ellison v. Campbell, 2014 OK 15, ¶ 13, 326 P.3d 68, 73. (Footnote and 
emphasis omitted.) The trial court did not abuse its discretion by determining 
the testimony of the three experts challenged by Chesapeake was admissible. 
Further, no reversible error is shown as to the jury instructions given and 
refused. The judgment entered on the jury's general verdict in favor of 
Plaintiffs and setting damages at $234,000 is AFFIRMED.
¶42 In a separate section of their answer brief, Plaintiffs request appeal 
related attorney fees and costs. However, the Oklahoma Supreme Court has revised 
the applicable rule on appellate attorney fees. Okla.Sup.Ct.R. 1.14(B) provides: 
"A motion for an appeal related attorney's fee must be made by a separately 
filed and labeled motion in the appellate court prior to issuance of mandate." 
Plaintiffs' request for appeal related attorney's fee is denied without 
prejudice to refiling pursuant to Okla.Sup.Ct.R. 1.14.

JOPLIN, P.J., concurs, and BUETTNER, J., concurs in result.

FOOTNOTES

[1] 
Allegations Chesapeake was unjustly enriched by failing to fulfill its 
obligations to prevent pollution were not included in a subsequent amended 
petition filed with leave of the trial court.

[2] Even 
so, there were numerous objections raised by Chesapeake over whether Plaintiffs' 
experts' live testimony violated the Third Amended Scheduling Order requiring 
"final opinions" in the deposition testimony and whether or not the later 
Pre-trial Conference Order superseded that earlier order.

[3] 
Effective December 9, 2013, the Legislature amended § 2702 to provide:
If scientific, technical or other specialized knowledge will assist the trier 
of fact to understand the evidence or to determine a fact in issue, a witness 
qualified as an expert by knowledge, skill, experience, training or education 
may testify in the form of an opinion or otherwise, if:
1. The testimony is based upon sufficient facts or data;
2. The testimony 
is the product of reliable principles and methods; and
3. The witness has 
applied the principles and methods reliably to the facts of the case.
That same date, it also amended § 2703 to provide:
The facts or data in the particular case upon which an expert bases an 
opinion or inference may be those perceived by or made known to the expert at or 
before the hearing. If of a type reasonably relied upon by experts in the 
particular field in forming opinions or inferences upon the subject, the facts 
or data need not be admissible in evidence in order for the opinion or inference 
to be admitted. Facts or data that are otherwise inadmissible shall not be 
disclosed to the jury by the proponent of the opinion or inference unless the 
court determines that their probative value in assisting the jury to evaluate 
the expert's opinion substantially outweighs their prejudicial effect.

[4] The 
jury heard testimony from Coslett just prior to that of Keen. Coslett testified 
he had used a pipeline locator device to detect pipelines buried roughly 10 feet 
deep or less and did so on three occasions, as had Chesapeake employees, but no 
pipeline was located. Coslett also testified the map showing an Aquila pipeline 
was inaccurate in several other respects, including the omission of two wells 
and the inclusion of a well that did not exist.

[5] The 
jury later heard Plaintiff Bettye Carnahan testify how, in 1992, Aquila was 
denied permission to locate a pipeline in the subject area and had constructed 
it in another section.

[6] 
Chesapeake introduced evidence of successful sales of previously polluted 
properties, all of which sales occurred after remediation of the pollution. Such 
market information is relevant when using the market stigma factor of Advisory 
Opinion No. 9 to assess damages, but not on point when addressing the value of 
property using the factor assessing damages based on the cost of remediation. 
Artman's damage analysis was premised on cost of remediation, not on market 
stigma. Which factor to use in this case presented a fact question for the 
jury.

[7] These 
theories and their "essential elements" were defined in Instructions No. 12, 13, 
14, 15, 17, and 18. Instruction 16 defined "direct cause."





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 1991 OK CIV APP 21, 813 P.2d 534, 62 OBJ 2667, Rogers v. Welltech, Inc.
Cited
 1995 OK CIV APP 63, 909 P.2d 131, 66 OBJ 3931, Union Texas Petroleum Corp. v. Jackson
Discussed at Length
 2005 OK CIV APP 33, 114 P.3d 1095, FRASIER, FRASIER & HICKMAN, L.L.P. v. FLYNN
Discussed
 2006 OK CIV APP 35, 134 P.3d 858, MEINDERS v. JOHNSON
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1940 OK 225, 103 P.2d 507, 187 Okla. 398, SHERIDAN OIL CO. v. WALL
Discussed
 1994 OK 117, 890 P.2d 847, 65 OBJ 3666, Schneberger v. Apache Corp.
Discussed
 1997 OK 7, 933 P.2d 282, 68 OBJ 306, Florafax International, Inc. v. GTE Market Resources, Inc.
Discussed
 2002 OK 24, 45 P.3d 86, JOHNSON v. FORD MOTOR CO.
Discussed
 2002 OK 60, 52 P.3d 1014, MYERS v. MISSOURI PACIFIC RAILROAD CO.
Discussed
 1973 OK 72, 512 P.2d 113, PARK v. SECURITY BANK AND TRUST COMPANY
Discussed
 1973 OK 129, 515 P.2d 1391, TENNECO OIL COMPANY v. ALLEN
Discussed
 2003 OK 10, 65 P.3d 591, CHRISTIAN v. GRAY
Discussed at Length
 2006 OK 58, 152 P.3d 165, GILBERT v. SECURITY FINANCE CORP OF OKLAHOMA, INC.
Cited
 2006 OK 67, 145 P.3d 1055, WORSHAM v. NIX
Discussed at Length
 2007 OK 76, 171 P.3d 890, SPENCER v. OKLAHOMA GAS & ELECTRIC COMPANY
Discussed
 2012 OK 5, 272 P.3d 705, COVEL v. RODRIGUEZ
Discussed
 2014 OK 15, 326 P.3d 68, ELLISON v. CAMPBELL
Discussed at Length
 1978 OK 12, 580 P.2d 505, WILKERSON MOTOR CO., INC. v. JOHNSON
Discussed
 1984 OK 52, 687 P.2d 1049, Tenneco Oil Co. v. El Paso Natural Gas Co.
Cited
 1986 OK 4, 716 P.2d 652, 57 OBJ 669, Woodall v. Chandler Material Co.
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2702, Testimony by Experts
Cited
 12 O.S. 2703, Bases of Opinion Testimony by Experts
Cited